Alice J. ARSHACK, Appellant,

v.

UNITED STATES, Appellee.

Louis M. BRADFORD et al., Appellants,

v.

UNITED STATES, Appellee.

Nos. 6882, 6883.

District of Columbia Court of Appeals.

Argued Sept. 13, 1973.

Decided June 25, 1974.

Kenneth C. Bass, III, Reston, Va., for appellants, and appointed by this court for appellant in No. 6882.

Gregory C. Brady, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Peter K. Mair, Asst. U. S. Attys., were on the brief, for appellee.

Before KERN, GALLAGHER and YEAGLEY, Associate Judges.

GALLAGHER, Associate Judge:

These appellants were found guilty after trial by jury of willfully and knowingly obstructing and impeding passage within the United States Capitol building.[1] Each was sentenced to a fine of $125.00 or thirty days incarceration. They appeal and make four principal assignments of error: (1) their conduct was within the protection of the First Amendment; (2) it was error for the trial court to fail to instruct the jury that it was the judge of the law as well as the facts; (3) the trial court's instruction on the requisite intent necessary for conviction was inadequate; and, (4) the failure of the trial court to instruct the jury that defendants should be acquitted if their actions were reasonably believed to be justified by obligations imposed by international law. We find no error justifying reversal and affirm.

On June 27, 1972, appellants and others (a group of about 150) climbed the steps of the east front of the Capitol which leads to the Senate wing. They carried a petition which they intended to present to a member of the Senate. The petition recited their grievances concerning United States involvement in Southeast Asia and asked Congress to act thereon.

At the top of the Capitol·steps they were met by a Senator and by the Chief of the Capitol Police. The Senator addressed the group, stated he would receive the petition and asked them not to block the corridors or interfere with the operation of the Sen-

1. D.C.Code 1973, § 9–123(b)(5).

ate. The Chief told the group that there were "certain limitations" on their right to petition Congress and requested them to abide by the rules and regulations of that body. The Chief also read to the group portions of D.C.Code 1973, § 9–123.[2] The portion of the Code at issue here was not read until a later time, however.

The Senator then led the group into the Capitol and through the passageways until they reached the corridor outside the Senate chamber.[3] At that time the Senate was in session and the Capitol Police had erected stanchions around the corridor in order to permit the group to have an area to express their views and to allow free passage in the corridor and the entrance to the Senate chamber abutting thereon. The group chose to disregard the stanchions, however, and assembled instead in the center of the corridor at the entrance to the Senate chamber. The petition was then read and presented to the Senator who carried it into the Senate chambers where he had it inserted in the Congressional Record.

It was at this point that two members of the group read prepared statements. One statement expressed the position that it was the responsibility of the individual "to obstruct the commission of the crimes of war," and that the time had come to act "even in symbolic defiance of some local ordinance . . . ." The other statement characterized the symbolism of the group's next act, lying down in the corridor. Approximately 120 persons in the group then sat or lay down in the corridor.

The Chief of the Capitol Police "announced to the group [that] they were blocking the corridors and that it was a violation of the statute and not to do so, and unless they either removed themselves from the corridors or placed themselves in a manner as to not obstruct the corridor, it would be necessary to place them under arrest." This announcement was made by bullhorn in order that all members of the group might hear the warning above the noise naturally created by a congregation of people that large. The Capitol Police then cordoned off the area. Appellants and many of their colleagues were arrested. All arrests were orderly. Each appellant has admitted presence in the corridor at the time of the arrests.[4]

At trial, in addition to testimony and photographs, a sound videotape of the above recited incident was received into evidence and viewed by the jury. In addition, the defendants who testified were permitted to state the beliefs and motives behind their actions on June 27. Certain instructions were requested and denied and the jury found each of the defendants guilty.

I

At the close of all evidence and again after the jury returned its verdict the defendants moved for a judgment of acquittal on the theory that their conduct was within the protection of the First Amendment to the Constitution. These motions were denied and appellants cite this as error.

---

2. The portions of the statute read were § 9–123(a)(2) which makes it unlawful "[k]nowingly, with force and violence, to enter or to remain upon the floor of either House of the Congress", and § 9–123(b)(4) which makes it unlawful for any person or group of persons willfully and knowingly:

To utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress

or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

3. There is no issue here as to how far inside the Capitol or how close to either chamber such a group should be permitted to congregate.

4. The case against one defendant was dropped by the government when it developed that the individual was seated in a window seat along the corridor.

The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Until appellants and their colleagues sat down in the corridor the record shows they were not hindered in presenting their petition to the Senate. It was only when the group chose to seat itself in the corridor that the Capitol Police moved to effectuate their arrest. At trial no defendant testified that these arrests took place simply because the group was petitioning for redress of grievances.

The issue then becomes a question of whether Congress can legislate against the impediment of passage through and the obstruction of its corridors by an aggrieved public which has come to express its complaints. It is appellants' contention that the Congress cannot so legislate where the conduct sought to be proscribed is "complementary" to concededly protected activity. Their argument is bottomed on the premise that their conduct, sitting and lying in the corridor, was an integral part of their petition to the Congress. While we recognize that in some respects appellants' conduct has First Amendment overtones we disagree with their conclusion that what they did cannot be constitutionally proscribed.

■■■ D.C.Code 1973, § 9–123(b)(5) provides:

> (b) It shall be unlawful for any person or group of persons willfully and knowingly—(5) to obstruct, or to impede passage through or within, . . . any of the Capitol buildings.

The purpose of the statute is to permit Congress to carry out the people's business unhindered by serious disruption. *See generally,* H.R.Rep. No. 745, 90th Cong., 1st Sess. (1967). Such statutes may be applied to symbolic conduct, that is, conduct which if done at another place might fall within the protection of the First Amendment. Here we are confronted with a narrowly drawn statute "evincing a legislative judgment that certain specific conduct be limited or proscribed." Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 684, 9 L.Ed.2d 697 (1963). Were such statutes to be rendered incapable of application we would not be able to preserve order in our society. While it may be that a society without controversy would be sterile, a society without order would be anarchic. The Supreme Court stated in Cox v. Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965):

> The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom, of speech or assembly. Governmental authorities have the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. [Citations omitted.]

Where in the context of complementing protected activity, the line is crossed into what is proscribed by statute, it is necessary to balance appellants' First Amendment rights with those sought to be pro-

tected by the statutory proscription. United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), sets out the test:

This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is, essential to the furtherance of that interest. [Footnotes omitted.]

There is no issue raised as to the power of Congress to enact, constitutionally, the statute involved in this case. The governmental interest sought to be protected is plain: insuring clear passage through the corridors for the public and the public servants in order that the latter might carry out their Constitutional duties and in order that the former might observe their government in action, and so that they too might be able to petition for redress of grievances.

■ We further conclude that the governmental interest is unrelated to the suppression of free expression. In fact, it furthers free expression by maintaining open passage for all the people. Finally, we conclude on the facts of this case that the incidental restriction on First Amendment freedom was no greater than necessary to effectuate the legislative purpose.

This is evident from the police action in roping off an area for the group to assemble while their petition was presented to the Senate. The group was not arrested immediately upon the blocking of the corridor but only after the Chief of the Capitol Police had again requested that they move to the area cordoned off for them. Given these circumstances, appellants' First Amendment rights were not unduly burdened.

■ Finally, appellants contend the record discloses that D.C.Code 1973, § 9–123(b)(5) is not enforced in a uniform and nondiscriminatory manner, thus allowing unfettered discretion in the Capitol Police in the determination of who may have the use of the corridor for peaceful assembly. Cox v. Louisiana, *supra*. *Cox*, however, was a street demonstration case while the incident leading to appellants' arrests took place in a corridor of the United States Capitol. It is true, no doubt, that the corridors of the Capitol are often momentarily blocked by groups of constituents and sightseers. But the record is devoid of any indication that these groups do not step aside to permit passage or that such obstructions are deliberate. Consequently, we fail to see any trace of discriminatory enforcement in this case.

II

At trial appellants requested that the following instruction be given to the jury:

Regardless of what you may decide the facts in this case to be, and regardless of the instructions that I have given as to the law in this case, you have the power to acquit the defendants for any reason you see fit. Courts cannot and will not search the minds of the jurors to determine the basis upon which you act. If you feel that the law under which the defendants in this case are accused is unjust, or that special circumstances justified the actions of the defendants, or that these defendants should be acquitted for any other reason that you may feel

proper, you have the power to return a not guilty verdict and the court will abide by that decision. You may *not,* however, convict these defendants for any reason you see fit. You may find the defendants guilty only if you are convinced beyond a reasonable doubt that they committed the crime charged as I have defined that crime for you. [Emphasis in original.]

This request was denied and appellants say this was reversible error.[5]

■■■■ While jury nullification, the essence of the proffered instruction, might once have been appropriate at common

law, the federal courts, following the lead of Justice Story in United States v. Battiste, 2 Sum. 240, Fed.Cas.No.14,545 (C. C.D.Mass.1835), long ago stopped giving such an instruction. The reason for this is well stated in United States v. Dougherty, 154 U.S.App.D.C. 76, 95, 473 F.2d 1113, 1132 (1972):

. . . The youthful passion for independence accommodated itself to the reality that the former rebels were now in control of their own destiny, that the practical needs of stability and sound growth outweighed the abstraction of centrifugal philosophy, and that the judges in the courts, were not the coloni-

---

5. Appellants' theory is quite simple. We have a statute that provides:

> The common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general Acts of Congress not locally inapplicable in the District of Columbia, and all Acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except in so far as the same are inconsistent with, or are replaced by subsequent legislation of Congress. [D.C.Code 1973, § 49–301.]

Article XV, § 5 of the Constitution of Maryland states that:

> In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact. . . .

Pursuant to this section the following instruction appearing in Wyley v. Warden, Maryland Penitentiary, 372 F.2d 742, 743 n. 1 (4th Cir.), cert. denied, 389 U.S. 863, 88 S.Ct. 121, 19 L.Ed.2d 131 (1967), is typical of that given in Maryland criminal cases:

> Members of the Jury, this is a criminal case and under the Constitution and the laws of the State of Maryland in a criminal case the jury are the judges of the law as well as of the facts in the case. So that whatever I tell you about the law while it is intended to be helpful to you in reaching a just and proper verdict in the case, it is not binding upon you as members of the jury and you may accept or reject it. And you may apply the law as you apprehend it to be in the case.

Article XV, § 5 did not exist until the Maryland Constitution of 1851. However the

court in Franklin v. State, 12 Md. 236, 249 (1858) stated "the constitutional provision on [the] subject is merely declaratory, and has not altered the pre-existing law regulating the powers of the court and jury in criminal cases." *But see and compare* Slansky v. State, 192 Md. 94, 102, 63 A.2d 599, 603 (1949), where it is stated that "[u]nder the Maryland Constitution of 1776 there was lack of uniformity in procedure with respect to instructions to juries in .criminal cases." From all of this the best that can be said is that there remains some uncertainty as to what the common law of Maryland was prior to the adoption of the Constitution of 1851. *See also,* Wyley v. Warden, Maryland Penitentiary, *supra* at 746 n. 6.

But more importantly, even if the common law of Maryland on this were readily discernible our statute, properly read, provides only "that we look to the laws of Maryland for guidance when a question novel to our law is before us. This statute does not demand blind allegiance, however, particularly as to the common law." White v. Parnell, 130 U.S.App.D.C. 148, 149 n. 1, 397 F.2d 709, 710 n. 1 (1968).

We are hardly willing to accept guidance on a practice variously described by Chief Judges of the state's courts as "archaic outmoded and atrocious", "a blight upon the administration of justice in Maryland", a "unique and indefensible procedure", a "Constitutional thorn" in "the flesh of Maryland's body of Criminal Law," Wyley v. Warden, *supra* at 745–46. Since the Maryland practice urged upon us by appellant does not come especially well recommended by the judiciary of that state, and since it is contrary to our established trial procedures, we would have to be rather hard put to accept guidance from Maryland law in this instance.

al appointees projecting royalist patronage and influence but were themselves part and parcel of the nation's intellectual mainstream, subject to the checks of the common law tradition and professional opinion, and capable, in Roscoe Pound's words, of providing "true judicial justice" standing in contrast with the colonial experience. [Footnote omitted.]

However, this has not negated the jury's power, which might be exercised in any case, "to bring in a verdict in the teeth of both law and facts," Horning v. District of Columbia, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920). As Judge Learned Hand put it:

> The institution of trial by jury—especially in criminal cases—has its hold upon public favor chiefly for two reasons. The individual can forfeit his liberty—to say nothing of his life—only at the hands of those who, unlike any official, are in no wise accountable, directly or indirectly, for what they do, and who at once separate and melt anonymously in the community from which they came. Moreover, since if they acquit their verdict is final, no one is likely to suffer of whose conduct they do not morally disapprove; and this introduces a slack into the enforcement of law, tempering its rigor by the mollifying influence of current ethical conventions.

United States ex rel. McCann v. Adams, 126 F.2d 774, 775–776 (2d Cir. 1942), rev'd on other grounds, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1943). No doubt juries sometimes act out of compassion and in disregard of the law. But we will not place upon such conduct by juries the stamp of judicial approval through an instruction from the court. To do so would actually encourage anarchy in the courtroom, and that might in the end harmfully

infect organized society. *See* United States v. Dougherty, *supra* at 96, 473 F.2d at 1134; United States v. Moylan, 417 F.2d 1002, 1006 (4th Cir. 1969), cert. denied, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970).

Justice Curtis stated why such a course is not suitable to our system of justice in United States v. Morris, 1 Curt. 62, 63, Fed.Cas.No.15,815 (D.Mass.1851):

> . . . As long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice. But, on the other hand, I do consider that this power and corresponding *duty of the court authoritatively to declare the law is one of the highest safeguards of the citizen.* The sole ends of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men. [Emphasis added.]

And as the Supreme Court stated in rejecting a course similar to that urged upon us here:

> . . . We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be. Under any other system, the courts, although established in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumentalities devised for the protection equally of society and of individuals in their essen-

tial rights. When that occurs our government will cease to be a government of laws, and become a government of men. Liberty regulated by law is the underlying principle of our institutions.

Sparf and Hansen v. United States, 156 U.S. 51, 102–103, 15 S.Ct. 273, 293, 39 L.Ed. 343 (1895). We see no error by the trial court in rejecting the proffered instruction.

### III

■ Appellants further requested the trial court to instruct the jury as follows:

In order to convict the defendants in this case, you must find beyond a reasonable doubt that they specifically intended to obstruct or impede passage in the United States Capitol Building. It is not enough to find that they intended to do what they actually did but you must find that they specifically intended to cause an obstruction or impediment of passage.

Instead the court gave the following instruction:

The term "willful" as used in the statute means that the act was committed by the defendants voluntarily, with knowledge that it was prohibited by a law and with the purpose of violating the law and not by mistake, accident, or in good faith. To act willfully means to do an act without a lawful excuse.

The word "knowingly" as used in the statute means that the defendants acted voluntarily and purposely and not because of a mistake or an accident or through inadvertence.

We find no error in the trial court's instruction. Appellants were amply warned that they were not to impede passage in the corridor, that they were in violation of the law when they sat and lay down, and that they would be arrested if they did not move into the areas cordoned off for their use. "The statutory requirement[s] of willfulness [and knowledge are] satisfied if the accused acted intentionally, with knowledge that he was breaching the statute." United States v. Moylan, *supra*, 417 F.2d at 1004.

### IV

■ Finally appellants requested, and were denied, this instruction:

The defendants in this case have raised the defense of justification because of overriding personal obligations imposed by international and domestic law and fundamental principles of humanity. The law is that individuals who commit non-violent acts of civil disobedience which do not cause injury to persons or property damage should be acquitted if they acted because of a good faith, sincere belief that their acts were required by international law, fundamental principles of humanity or basic obligations under the United States Constitution. It would be a complete and total defense to the charges in this case that the defendants believe that the conduct of the war in Indochina by the United States government is illegal under international or domestic law, outrageously immoral or beyond the limits of humane conduct, and that they further believe that their petition for the redress of grievances may in some way change the governmental conduct they oppose.

We see no error in the denial of this instruction. Chief Judge Greene has explained why instructions such as that urged here must be rejected:

The Court does not doubt that these defendants profoundly believe the hostilities in [Vietnam] to be wrong, and that they believe with equal sincerity that

they have the right, indeed the obligation, to bring home to the American people the story of [Vietnamese] suffering, if necessary by such actions as those revealed by the evidence in this case. Yet if that faith and that belief were to be accepted as a valid legal defense to the crime charged here, the belief and faith of others in other causes would surely have to be accorded the same treatment. . . .

\* \* \* \* \* \*

None of this should be taken to mean that motivations and purposes, to the extent that they are ascertainable, should be wholly disregarded in the legal process. In criminal cases, the gravity of the offense will be weighed at the time of sentencing, together with the character, background, and the apparent purposes of the offender. But to permit a man's claim that he acted in accordance with the dictates of his conscience to constitute a defense to an otherwise criminal act would lead the instruments of justice down from the certainties of the rule of law, equally and impartially applied to ascertainable facts, to an impossible search for motivations and beliefs. In that kind of a search, for which there could almost by definition be no objective standards, the courts, and hence the weight of government, would inevitably end up protecting those whose philosophy happened to be favored by the men in power at any given time while finding wanting the purpose, the belief, and the sincerity of those who harbored an opposite viewpoint.[6] Though appellants' actions arguably may be classified in an historical sense as acts of civil disobedience, this is unavailing in the criminal justice system. Under the circumstances of this case they should not now be heard to complain of the penalty imposed by society upon their actions.

Affirmed.

6. United States v. Gaeng, 101 Wash.L.Rep. 1973, 1979 (Super.Ct.D.C.1973).