Peter G. **FARINA,** Kelly D. Sullivan, Louis R. Juluke, Ann G. Fullerton, Hattie A. Peterson, Douglas A. Hill, Appellants,

v.

**UNITED STATES of America, Appellee.**

Nos. 88–CM–1450, 88–CM–1476, 88–CM–1477, 88–CM–1478, 88–CM–1544, 88–CM–1545.

District of Columbia Court of Appeals.

Argued Nov. 10, 1992.
Decided March 19, 1993.

---

Mark L. Goldstone, with whom Peter G. Farina, pro se, was on the brief, for appellants.

G. Bradley Weinsheimer, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

Appellants appeal their convictions under D.C.Code § 9–112(b)(5) (1989 Repl.), on two grounds relating to the jury instructions. First, they contend that without a limiting construction requiring that serious disruption is an element of the offense, the statute is unconstitutional as applied to their non-violent protest on the Capitol Grounds, and hence, the trial judge erred by not instructing the jury that to convict it had to find that appellants' conduct caused a serious disruption. Second, they contend that the trial judge erred by not instructing the jury on its power to acquit by jury nullification. Finding these contentions unpersuasive, we affirm.

## I.

On June 13 and 14, 1988, there was a demonstration on the East lawn of the Capitol Grounds to dramatize the need to respond to the crisis of homelessness. This demonstration, pursuant to a permit, was under the aegis of the Community for Creative Non–Violence (CCNV), and lasted from approximately noon on the 13th to noon on the 14th. At approximately noon on June 14, a group of seventy-five to one hundred people walked from the East lawn demonstration to the South entrance to the Capitol Grounds, known as the South Barricade.[1] Apparently, plans for this second demonstration were not known by appellants in advance. The police, nevertheless, knew about it as much as a day ahead of time and were aware that CCNV intended to block traffic.

By the time the group from the East lawn demonstration arrived at the South entrance, at approximately 12:00 or 12:10 p.m., the police, who had begun redirecting traffic to the North entrance in anticipation of the second demonstration, had closed the street to traffic. There were two police cars, a paddy wagon, a fifty-passenger bus, and several motorcycles parked in the crosswalk as well as approximately thirty police officers at the South Barricade.

The South Barricade demonstrators were in two groups, those on the sidewalk and approximately thirty-four in the street. Those in the street sat down in a circle, which extended from one curb to the other. They held hands, and after a silent prayer, they began to sing. Sitting in a circle on the street was apparently spontaneous and unplanned. The main purpose of the second demonstration was to dramatize, and make more visible, concern about homelessness. At the time, legislation was pending in the House of Representatives to provide assistance to the homeless. Appellant Farina testified that he was present because he was concerned about Congressional spending policies related to homelessness, and about the needs of homeless children. He viewed his activities on June 14 as "consistent with conducting official business, i.e., petitioning Congress in an attention-getting manner," and stated that he did not intend to break the law or obstruct

---

1. The South Barricade is a restricted-access road which has a sign saying "Official Business Only" and is open only to congresspersons, those who have appointments with congresspersons, delivery persons, and so on.

or impede passage on United States Capitol grounds. He acknowledged, however, that he knew at the time of the demonstration that "there was a possibility that his action would put him in jeopardy of arrest." Other appellants testified that they had no intent to obstruct or impede traffic, and appellants Sullivan and Fullerton maintained that they did not, in fact, obstruct traffic, nor intend to get arrested. Several appellants admitted, however, that a car could not have driven through the street without hitting one of the demonstrators. Several also testified that they would have moved if a car had attempted to pass.

Lieutenant Howe, who was in charge at the South Barricade, testified that a roll call vote was taking place in the House at the time of the second demonstration. He indicated that thirty to fifty Members of Congress drive and park at the House steps to go inside to vote. However, there was no evidence that any Member of Congress had attempted to drive through the South Barricade and been unable to do so, and no Member of Congress or tourist complained to the police that she or he could not get by. The sidewalk was not blocked to pedestrian traffic, and there was evidence that Members of Congress and others had been able to walk by on the sidewalk.

Approximately one minute after the group sat in the street, a police officer warned them that if they did not move they would be arrested. More police officers arrived, and began arresting the demonstrators. Each person was individually informed by the arresting officer that she or he could leave and suffer no consequences, or could remain and be arrested. The police did not offer the demonstrators an alternative forum. Although some officers testified that the warning they gave meant that the demonstrators would not be arrested if they moved to the sidewalk, this was not communicated directly to appellants, who were told that they had to "leave" or be arrested.

Thirty-four demonstrators were arrested between 12:30 p.m. and 12:40 p.m. Members of the press and other observers, approximately sixty to one hundred people, who were watching the demonstration from the sidewalk, were not arrested, although the sidewalk became congested so that members of Congress had to "bob and weave" to get through, which took a few seconds of the representatives' time. The free flow of traffic at the South Barricade resumed at approximately 12:40 p.m.

## II.

D.C.Code § 9–112(b)(5) (1989 Repl.), provides, in relevant part, that "[i]t shall be unlawful for any person or group of persons willfully and knowingly ... [t]o obstruct, or to impede passage through or within, the United States Capitol Grounds." At trial, appellants requested the judge to instruct the jury that "serious disruption" was a required element of the statute. They relied on the language in *Arshack v. United States*, 321 A.2d 845, 848 (D.C. 1974), that "[t]he purpose of the statute is to permit Congress to carry out the people's business unhindered by serious disruption," citing the House legislative report. The judge refused to give the instruction, reasoning that the statute was not restricted to cases of serious disruption. Instead, the judge instructed the jury that the government had to prove that appellants were (1) obstructing or impeding passage through the capitol grounds, (2) doing so knowingly and willingly, and (3) that appellants' actions "interfered on a more than minimal basis with the orderly processes of the Congress."[2] Appellants contend that § 9–112(b)(5) is unconstitutional as applied to them,[3] and that the trial

---

**2.** Appellants moved for judgments of acquittal on the grounds that *Arshack* required a showing of serious disruption which was not present, that appellants had not obstructed traffic because traffic diversion was caused by the police, that the First Amendment required that appel-

lants be offered an alternative forum, and that the First Amendment protected their actions.

**3.** Appellants do not argue that § 9–112(b)(5) is facially unconstitutional.

judge erred by denying their motions for judgments of acquittal.[4]

■ Like the Capitol Grounds,[5] streets are traditional fora for expression.[6] *See United States v. Wall,* 521 A.2d 1140, 1143 & n. 4 (D.C.1987) (streets are the "quintessential public forums") (citation omitted). Thus, the Supreme Court stated in *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra,* 391 U.S. at 315, 88 S.Ct. at 1606, that "[t]he essence of [previous] opinions is that streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." The South Barricade, a street on the Capi-

4. The government argues that appellants should appeal the denial of their motion to dismiss if their claim is that the statute cannot constitutionally apply, and from the judgment of acquittal only if they argue that the evidence did not meet the statutory requirements. However, appellants sought judgments of acquittal on the grounds that the statute could not constitutionally apply to them, which are the same grounds they present on appeal. *See Arshack, supra,* 321 A.2d at 847 (appeal from denial of motion for judgment of acquittal contending conduct protected by First Amendment).

5. As this court stated in *Wheelock v. United States,* 552 A.2d 503, 506 (D.C.1988):

"[t]he general concepts of First Amendment freedom are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause in the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances." *A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 131, 516 F.2d 717, 724 (1975). The courts in this jurisdiction have long recognized that "[t]he United States Capitol is a unique situs for demonstration activity" and "is a place traditionally open to the public ... to which access cannot be denied broadly or absolutely, [a fact which must be weighed] against the government's interest in protecting against possible 'damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff.'" *Kroll v. United States,* 590 F.Supp. 1282, 1289, 1290 (D.D.C.1983) (quoting *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575, 583–85 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972).
*See also United States v. Nicholson,* 97 Daily Wash.L.Rptr. 1213 (1969) (appended to *Dellums v. Powell,* 184 U.S.App.D.C. 275, 316, 566 F.2d 167, 203 (1978), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978)) (federal capitol is traditional public forum just as state capitols are), *aff'd,* 263 A.2d 56 (D.C.1970); *Jeannette Rankin Brigade v. Chief of Capitol Police, supra,* 342 F.Supp. at 583–85 (capitol grounds are a public forum); *cf. Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963) (state capitol grounds were traditional public forum); *Adderley v. Florida,* 385 U.S. 39, 41, 87 S.Ct. 242, 244, 17 L.Ed.2d 149 (1966) ("[t]raditionally, state capitol grounds are

open to the public"). *Compare Pearson v. United States,* 581 A.2d 347, 353 & n. 13 (D.C.1990) (Supreme Court plaza is not a public forum even though it "has traditionally been open to the public"; Supreme Court has "acknowledged the distinction between the judiciary and the legislature").

6. *See Frisby v. Schultz,* 487 U.S. 474, 480–81, 108 S.Ct. 2495, 2500–01, 101 L.Ed.2d 420 (1988) (citations omitted); *Flower v. United States,* 407 U.S. 197, 198, 92 S.Ct. 1842, 1843, 32 L.Ed.2d 653 (1972) (citation omitted); *Kunz v. New York,* 340 U.S. 290, 293–94, 71 S.Ct. 312, 314–15, 95 L.Ed. 280 (1951); *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983) (citations omitted); *Shuttlesworth v. City of Birmingham, Alabama,* 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969) (citation omitted); *Jeannette Rankin Brigade v. Chief of Capitol Police, supra,* 342 F.Supp. at 583 (quoting *Amalgamated Food Employees Union Local 509 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 315, 88 S.Ct. 1601, 1606, 20 L.Ed.2d 603 (1968), *overruled on other grounds, Hudgens v. N.L.R.B.,* 424 U.S. 507 (1976)); *Pearson, supra,* 581 A.2d at 351 n. 9 (streets are public forums) (citing *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)); *Nicholson, supra,* 184 U.S.App.D.C. at 315, 566 F.2d at 202) (citation omitted).

The official-use-only nature of this particular street on the Capitol Grounds does not change the analysis. The street on which appellants sat was a restricted access street with a sign marked "official business only." This road was, arguably, not open to the general public. *But cf. Markowitz v. United States,* 598 A.2d 398, 404 n. 5 (D.C.1991) (not relying on restricted-access nature of corridor outside house chamber to find that hallway was a "nonpublic forum"; the terms "restricted" and "nonpublic forum" are not necessarily "coextensive"). The street was on the Capitol Grounds, which have traditionally been a public forum, and in any event, the evidence indicates that the street and surrounding sidewalks were open to foot traffic by tourists and others at the relevant time at issue. *Compare United States v. Kokinda,* 497 U.S. 720, 726–28, 110 S.Ct. 3115, 3119–20, 111 L.Ed.2d 571 (1990) (sidewalk between a post office and its parking lot, used only for access to the post office, was not a public forum; government as proprietor).

tol Grounds, is therefore a public forum where reasonable time, place, and manner limitations on First Amendment rights, such as the restrictions in § 9–112(b)(5), may be constitutional. *Wall, supra*, 521 A.2d at 1143. *See also United States v. Grace*, 461 U.S. 171, 177, 103·S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Markowitz, supra*, 598 A.2d at 403; *Pearson, supra*, 581 A.2d at 351. The Supreme Court has made clear that "even in a public forum the government may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). *See International Soc'y for Krishna Consciousness, Inc. v. Lee*, — U.S. —, —, 112 S.Ct. 2711, 2720, 120 L.Ed.2d 541 (1992) (Kennedy, J., concurring). In response to appellants' contention that the statute is unconstitutional as applied to them in the absence of a limiting construction requiring proof of serious disruption, the government has the burden to show that there are compelling reasons to limit First Amendment rights on the United States Capitol Grounds, a quintessential public forum. *See Nicholson, supra*, 184 U.S.App.D.C. at

315, 566 F.2d at 202 (citing *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)).[7]

Section 9–112(b)(5) is aimed at achieving a significant and important government interest in ensuring the smooth and efficient functioning of the legislature by facilitating the unimpeded flow of traffic. The Supreme Court has acknowledged that the government has a significant interest in controlling traffic. In *Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), the Court stated that:

> The control of travel on the streets is a clear example of governmental responsibility to ensure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection.

*Cox v. Louisiana, supra*, 379 U.S. at 554, 85 S.Ct. at 464 (other citations omitted), *quoted in Abney II, supra*, 451 A.2d at 83, and *Arshack, supra*, 321 A.2d at 848. *Cf. Markowitz, supra*, 598 A.2d at 405 (importance of "free passage to attend meetings and hearings" inside the Capitol building). In the words of the Supreme Court, "[a] group of demonstrators could not insist upon the right to cordon off a street ... and allow no one to pass who did not agree to listen to their exhortations." *Cox v. Louisiana, supra*, 379 U.S. at 555, 85 S.Ct. at 464 (citations omitted).

---

7. The question of whether § 9–112(b)(5) is unconstitutional without a limiting construction is "a fact-free general principle of law," reviewed *de novo*, "without deference to [the trial] court's findings." *Davis v. United States*, 564 A.2d 31, 35 (D.C.1989) (en banc) (citations omitted). Whether the statute could constitutionally be applied to appellants' conduct is a mixed question of law and fact. *See id.* (citations omitted). For such mixed questions, courts may choose between the *de novo* standard used for questions of law or the clearly erroneous standard applied to questions of fact, or they may "review[ ] the factual issue under the 'clearly erroneous' standard and the legal issue under the 'de novo' standard." *Id.* at 36 (citations omitted).

"As a matter of practice, it appears that many courts elect to review *de novo* in the mixed question context." *Id.*

In other cases concerning the facial and as-applied constitutionality of similar statutes, the court has applied a *de novo* standard of review. *See Arshack, supra*, 321 A.2d 845 (obstructing passage in Capitol building); *Abney v. United States*, 451 A.2d 78, 84, 81 n. 8 (D.C.1982) (*Abney II*, as contrasted with *Abney v. United States*, 175 U.S.App.D.C. 247, 534 F.2d 984 (1976) (per curiam) (*Abney I*)) (Capitol Grounds traffic regulation); *Markowitz v. United States*, 598 A.2d 398 (D.C.1991) (demonstrating in Capitol building, bench trial); *Wheelock, supra*, 552 A.2d 503 (unlawful entry statute).

Section 9–112(b)(5) also clearly leaves open "ample alternative channels of communication," *Wall, supra,* 521 A.2d at 1143, as required for a reasonable time, place and manner restriction. Demonstrations may be conducted on sidewalks and on the grassy areas of the Capitol Grounds, and at other times and in other manners, rather than by sitting in a huge thirty-four-person circle covering the entire width of one of the few streets on the Capitol Grounds while a roll call vote is taking place.

■■■ The question then is whether § 9–112(b)(5) is narrowly tailored. This requirement does not mean that the government must "grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Markowitz, supra,* 598 A.2d at 403 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985)) (other citation omitted). "Narrowly tailored" also does not require the government to choose the least restrictive alternative to accomplish its objectives. *Abney v. United States,* 616 A.2d 856, 861 (citation omitted) (*Abney III*); *Pearson, supra,* 581 A.2d at 354–55; *Markowitz, supra,* 598 A.2d at 406 (quoting *Ward v. Rock Against Racism, supra,* 491 U.S. at 798, 109 S.Ct. at 2757). However, the means used must not be "substantially broader than necessary to achieve the government's interest." *Markowitz, supra,* 598 A.2d at 406 (quoting *Ward v. Rock Against Racism, supra,* 491 U.S. at 800, 109 S.Ct. at 2758).

The Supreme Court has instructed that "[t]he nature of the place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.'" *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (demonstration

on sidewalk outside high school) (citations omitted). Therefore, the "pattern of normal activities" in the South Barricade, an "official business only" street on the Capitol Grounds, defines the nature of a constitutional restriction. In other words, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Id. See also Wheelock, supra,* 552 A.2d at 506 (quoting *Grayned, supra,* 408 U.S. at 116–17, 92 S.Ct. at 2303–04) (other citation omitted). The evidence showed that normal activity at the South Barricade was basically to serve as a conduit for vehicular travel by Members of Congress and other persons with official business at the Capitol, and to allow pedestrian traffic by those and other persons, such as tourists. *See* note 1, *supra.* Hence, appellants' conduct, involving sitting in a circle of thirty-four people spanning the entire width of the South Barricade, while a roll call vote was taking place, thereby blocking all vehicular passage, was incompatible with that function.

Section 9–112 (b)(5) is a reasonable time, place and manner restriction. *See Ward v. Rock Against Racism, supra,* 491 U.S. at 791, 109 S.Ct. at 2754 (citation omitted). As applied to appellants, the statute forbade their sitting, in one of the very few streets for vehicular traffic leading to the Capitol buildings, in a circle which occupied the entire width of a two-lane street, while a roll call vote was taking place in the House of Representatives.[8] Thus, the trial judge's instructions to the jury, requiring a finding of more than minimal interference, assured that § 9–112(b)(5) would be constitutionally applied by the jury to appellants' actions as a reasonable time, place, and manner restriction, without instructing that serious disruption is an element of the offense. The instructions limited the scope of the statute in a manner consistent with the holding in *Abney II, supra,* that the

---

8. The statute does not forbid all expressive conduct in the streets. *Compare Jeannette Rankin Brigade, supra,* 342 F.Supp. at 585 (invalidating federal statute forbidding parades or assemblages on the Capitol Grounds because although

statute may serve interests such as preventing traffic obstructions, its "terms ... flatly prohibit all assemblages, whether or not they threaten those interests").

government had to show that the defendant's presence actually or potentially threatened the movement of traffic on the Capitol Grounds. 451 A.2d at 83–84.[9] *Cf. Feeley v. District of Columbia,* 220 A.2d 325, 327 (D.C.1966) (§ 22–1107 (1989 Repl.), forbidding congregating on a public street and refusing to move when ordered by police, may be constitutionally applied to demonstrators on the Capitol grounds where "no proof of an actual or impending breach of the peace," when the police reasonably believe there may be violence or a disturbance), *vacated on other grounds,* 128 U.S.App.D.C. 258, 387 F.2d 216 (1967). Appellants' reliance on the "serious disruption" statement in *Arshack, supra,* 321 A.2d at 848, is misplaced; the statement did not describe an element of the offense, but addressed Congress's purpose for enacting such a statute.

█ Appellants fare no better under the test enunciated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1967), and applied by this court in order to determine whether statutes restricting expressive conduct are constitutional as applied. *See, e.g., Abney II, supra,* 451 A.2d at 83; *Arshack, supra,* 321 A.2d at 849; *cf. Markowitz, supra,* 598 A.2d at 405. The *O'Brien* Court stated that:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest

is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien, supra,* 391 U.S. at 377, 88 S.Ct. at 1679. The *O'Brien* test is very similar to the time, place, and manner test. *See Clark, supra,* 468 U.S. at 298, 104 S.Ct. at 3071.[10] The Supreme Court has "recognized that the standards for assessing time, place, and manner restrictions are little, if any different from the standards applicable to regulations of conduct with an expressive component." *International Soc'y for Krishna Consciousness, Inc. v. Lee, supra,* —— U.S. at ——, 112 S.Ct. at 2721 (citing *Clark, supra,* 468 U.S. at 298 & n. 8, 104 S.Ct. at 3071 & n. 8; *Ward v. Rock Against Racism, supra,* 491 U.S. at 798, 109 S.Ct. at 2757, *Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion)). In general, speech mixed with conduct may be more severely regulated than pure speech. *See Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra,* 391 U.S. at 313, 88 S.Ct. at 1605; *Jeannette Rankin Brigade, supra,* 342 F.Supp. at 584 (citations omitted).

Appellants concede that § 9–112(b)(5) meets the first three *O'Brien* criteria. That conclusion is consistent with this court's application of the *O'Brien* test. *See, e.g., Abney II, supra,* 451 A.2d at 83–84.[11] Rather, they maintain that the stat-

**9.** In *Abney II,* the court held that a traffic regulation, aimed at allowing traffic "to proceed in a safe and unimpeded fashion," "clearly implies a legislative and administrative purpose sufficient to support a restriction of the scope of [the regulation] to instances where the 'acts or conduct [interfere] with the orderly processes of the Congress, or with the safety of individual legislators, staff members, visitors or tourists....' As so limited, [the regulation] is constitutional." *Id.* at 83. (citations omitted).

**10.** The time, place and manner test applies to both verbal expression and expressive conduct, while the *O'Brien* test applies only to expressive conduct. *See Clark, supra,* 468 U.S. at 293–94, 104 S.Ct. at 3068–69. The Supreme Court sometimes applies both tests to expressive conduct. For example, in *Clark,* the Court first examined a regulation under the time, place, and manner

standard, and then stated that "the foregoing analysis demonstrates that the ... regulation is sustainable under the four-factor standard of ... *O'Brien* ... for validating a regulation of expressive conduct, which, in the last analysis is little, if any, different from the standard applied to time, place or manner restrictions." *Id.* at 298, 104 S.Ct. at 3071. *See id.* at 298 n. 8, 104 S.Ct. at 3071 n. 8 (suggesting that a restriction which passes the time, place and manner test should not be invalidated as failing the *O'Brien* test because the former should be a stricter test than the latter, since restrictions on pure speech must be evaluated more stringently than restrictions on expressive conduct).

**11.** The *Abney II* court concluded that:

> It is certainly within a government's power to regulate traffic and activities which might oth-

ute fails to meet *O'Brien*'s fourth requirement because the statute is not merely an "incidental" restriction on First Amendment freedoms and is more restrictive than is essential to achieve the government's objectives. For the reasons noted in addressing whether the statute was narrowly tailored, *see* pages 55–56, *supra*, this argument clearly fails. *See United States v. Albertini,* 472 U.S. 675, 688, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985);[12] *see also Abney III, supra,* at 861. Under *Abney II*'s analysis, § 9–112(b)(5) meets the fourth *O'Brien* criteria of an incidental restriction no greater than essential to meet the government's interest, and is not unconstitutional as applied to appellants, who had positioned themselves in such a manner as to block vehicular traffic. *See Abney II, supra,* 451 A.2d at 83–84. In *Arshack, supra,* 321 A.2d at 848, the court held that § 9–123(b)(5), which is identical in relevant part to the current § 9–112(b)(5), was narrowly drawn. The court was satisfied that the incidental restriction caused by the police roping off an area for the group to assemble while presenting their petition to ·the Senate, so that the group would not block passage through the corri-

dor, was "no greater than necessary to effectuate the legislative purpose." *·Id.* at 849. The fact that appellants were blocking a street, while the demonstrators in *Arshack, supra,* 321 A.2d at 847, were blocking a corridor inside of the Capitol, is a distinction that, at least here, does not change the analysis. The likelihood of interference with the business of the legisla-· ture from blockage of the South Barricade street was manifest since a roll call vote was being held and forty to fifty Members of Congress usually drove through the South Barricade to the Capitol to vote. Accordingly, the trial judge correctly ruled in denying appellants' requested instruction that such actual and "potential" disruption met *O'Brien*'s requirement that restrictions on First Amendment rights be only incidental and only as stringent as essential to meet the government's interests.

◼ Appellants' contention that the trial judge erred by not applying the tourist standard[13] is meritless in view of the instruction that was given, requiring a finding of more than minimal interference and the fact that appellants' conduct resulted in

---

erwise obstruct its orderly operations. Further, the regulation also clearly promotes an important government interest, i.e., the unobstructed flow of traffic on the Capitol grounds. *See Arshack v. United States, supra,* 321 A.2d at 849. Likewise, it is obvious that the governmental interest at issue, the free flow of traffic, is not related to the suppression of free expression. *See Cox v. Louisiana, supra,* [379 U.S.] at 554, 85 S.Ct. at 464. *Abney II, supra,* 451 A.2d at 83. The court has also stated that the government's interest in keeping the hallways inside Capitol buildings clear is not related to suppressing First Amendment rights. *Arshack, supra,* 321 A.2d at 849.

**12.** In *Albertini; supra,* the Supreme Court explained that:

an incidental burden on speech is no greater than is essential, ·and therefore permissible under *O'Brien,* so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.

472 U.S. at 689, 105 S.Ct. at 2906 (citation omitted).

**13.** In *Nicholson, supra,* the trial judge stated the tourist standard by observing that it would be constitutional to penalize:

acts or conduct which interferes with the orderly processes of the Congress, or with the safety of individual legislators, staff members, visitors, or tourists, or their right to be free from intimidation, undue pressure, noise, or inconvenience.... It is appropriate, therefore, under the statute, to bar or to order from the Capitol Grounds, any group which is noisy, violent, armed, or disorderly in behavior; any group which has a purpose to interfere with the processes of the Congress, any Member of Congress, congressional employee, visitor, or tourist; any group which has the effect, by its presence, of interfering with the processes of Congress, any Member of Congress, congressional employee, visitor, or tourist; and any group which damages any part of the buildings, shrubbery, or plant life.... [and] [i]n each category, the conduct would have to be more disruptive and more substantial (in degree or number) than that normally engaged in by tourists and others and routinely permitted on the Grounds. 184 U.S.App.D.C. at 317, 566 F.2d at 204–05 & n. 22. In *Nicholson,* the trial court, later upheld on appeal, ruled that D.C.Code § 9–124, forbidding moving or standing assemblies on Capitol grounds, was constitutional only if limited by a tourist standard. *Id.,* 566 F.2d at 204–05 & n. 22.

the complete blockage of vehicular traffic at the South Barricade.[14] *Cf. Reale v. United States,* 573 A.2d 13, 15 (D.C.1990) (under § 9–112(b)(4), forbidding disorderly conduct in Capitol building, tourist standard not an element of the offense but only a test of whether the statute is constitutional as applied).

Likewise, appellants' contention that their arrests were not merely an "incidental restriction" on First Amendment freedoms, no greater than essential to serve the government interest, as required by *O'Brien,* because "there were many alternatives short of arrest and prosecution," such as cordoning off part of the street, is meritless. Contrary to appellants' argument that the statute was unconstitutional as applied because they were not offered an alternative forum in which to exercise their First Amendment rights, the government is not required to choose the least-restrictive alternative. *See Ward v. Rock Against Racism, supra,* 491 U.S. at 798, 109 S.Ct. at 2757. Furthermore, the government had provided appellants an alternative site on the East lawn where they had demonstrated for the previous twenty-four hours and a second demonstration was continuing on the sidewalk near the South Barricade. *See Wall, supra,* 521 A.2d at 1145; *see also Abney III, supra,* 861–62; *Leiss v. United States,* 364 A.2d 803, 808 (D.C.1976) (no demonstration on White House grounds, but demonstrator could have moved fifteen feet away and been outside White House grounds), *cert. denied,* 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Unlike the corridor in *Arshack, supra,*[15] the street which appellants' circle spanned was closely surrounded and bordered by other fora, namely, the sidewalks and grassy areas immediately abutting the South Barricade.[16] At least one of the appellants testified to understanding the police officers' warnings to mean that the demonstrators could have avoided arrest by moving to the sidewalk and did not need to leave the area entirely. Appellants have not shown that their message or communication required their sitting down across the entire width of a two-lane street, which was one of the few roads providing vehicular access to the Capitol building.[17]

---

**14.** The "tourist standard" was applied in *Wheelock, supra,* 552 A.2d at 508, where a demonstration in the Rotunda caused tourists and others to detour around the demonstrators but did not interfere with viewing or passing through the Rotunda. In *Arshack, supra,* 321 A.2d at 849, the court noted that "[i]t is true ... that the corridors of the Capitol are often momentarily blocked by groups of constituents and sightseers. But the record is devoid of any indication that these groups do not step aside to permit passage or that such obstructions are deliberate." Appellants mistakenly maintain, in addition, that the tourist standard indicates that serious rather than de minimis disruption is required before one can be prosecuted for speech and expression which violates a statute such as § 9–112(b)(5). The tourist standard refers only to conduct that is not more disruptive than that of a group of tourists, rather than specifying *serious* or *de minimis disruption. See Nicholson, supra,* 184 U.S.App.D.C. at 317–18 & n. 22, 566 F.2d at 204–05 & n. 22. *See also Dellums v. Powell, supra,* 184 U.S.App.D.C. at 287, 291, 566 F.2d at 179, 183 (D.C.Code §§ 9–124, 22–3102 (1973), which forbid parades, processions, or assemblages on the Capitol Grounds, and unlawful entry, respectively, unconstitutional as applied unless demonstrators were loud or disorderly, or had the purpose or effect of "interfering with the processes of the Congress") (citation omitted).

**15.** In *Arshack,* the court viewed the fact that an alternative forum was provided as evidence that "the incidental restriction on First Amendment freedoms was no greater than necessary to effectuate the legislative purpose." 321 A.2d at 849.

**16.** We do not suggest, however, that the police must specially create a new forum where other alternatives for reaching the same audience are readily available close by, nor that demonstrators must be specifically told of an alternative forum. This is distinct from the necessity for the government to show that alternative forums exist. Availability of alternative forums lessens the burden placed on free speech by restriction of any particular forum. *See Markowitz, supra,* 598 A.2d at 407 (citations omitted). In *Wheelock, supra,* 552 A.2d at 507, the court concluded that it was "significant that the Capitol Police never offered the group an alternative to leaving the center of the Rotunda."

**17.** Arguably, if the particular site is necessary for the method or content of a protest, the government must show serious or severe traffic disruption before its interest in unimpeded traffic flow can outweigh the demonstrators' interests in free speech. *See Abney II, supra,* 451 A.2d at 84 (regulation was unconstitutional as applied regardless of available alternative fo-

■ Finally, appellants' contention that the South Barricade was blocked primarily by the police, and not by them, is an argument that there was insufficient evidence that they violated the statute. We find no error by the trial judge in denying appellants' motions for judgment of acquittal. *See Bridges v. United States*, 381 A.2d 1073, 1079 (D.C.1977) (standard of review for sufficiency of the evidence claims) (citation omitted), *cert. denied*, 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). Evidence as to whether appellants or the police first blocked traffic was susceptible to more than one reasonable interpretation. There was no evidence of the exact second when the police began redirecting traffic. A reasonable juror could have found beyond a reasonable doubt that appellants caused the traffic to be redirected. Appellants do not argue that the police officers' alleged anticipatory blocking of the South Barricade lured them into using the street for part of their second demonstration. *Cf. Wheelock, supra*, 552 A.2d at 509.

Accordingly, we hold that the trial judge did not err in refusing to give a jury instruction, which included as an element of § 9–112(b)(5) the requirement that the jury find that appellants' conduct caused serious disruption of Congress' ability to conduct its business.

### III.

■ Finally, consistent with binding authority, we find no error by the trial judge in refusing to give a jury nullification instruction.[18]

■ Jury nullification "permits jurors to acquit a defendant on the basis of their notions of justice, even if they believe he or she is guilty as a matter of law." *Reale, supra*, 573 A.2d at 15. Jury acquittals are unreviewable and unreversible. *See United States v. Dougherty*, 154 U.S.App.D.C. 76, 93, 95, 473 F.2d 1113, 1130, 1132 (1972). Courts have held that while the jury has the power to ignore the law in order to find a defendant not guilty, that power is to be used sparingly and courts will not inform the jury of that option.[19] While acknowledging that "[n]o doubt juries sometimes act out of compassion and in disregard of the law," this court has concluded that it "will not place upon such conduct by juries the stamp of judicial approval through in-

---

rums because defendant's sleeping on capitol grounds "was a continuation of his ongoing protest" which had included sleeping on the grounds almost every night for years, and the record did not show any alternatives; restrictions on First Amendment rights may not be greater than "essential to the government's interest in unimpeded traffic"). This court has also concluded that a defendant handing out commercial leaflets near a Metro station escalator "was informed that he could continue his leafletting without interruption if he moved to the sidewalk. At that location, there is no dispute but that appellant could have reached *the very same audience* he was soliciting when arrested." *O'Brien v. United States*, 444 A.2d 946, 949 (D.C.1982) (emphasis added). *But see Pearson, supra*, 581 A.2d at 353.

18. Appellants requested, and were denied, a jury instruction stating that the jury could acquit even if the government proved all elements of the crime beyond a reasonable doubt. Over objection, the jury was instructed that it had a "duty to accept the law as [the judge] state[s] it to you," that if the government proved its case beyond a reasonable doubt, the jury had a duty to find the defendants guilty, and that "you may not question the wisdom of any rule of law." Appellant Farina mentioned something ap-

proaching the jury nullification power in his closing argument to the jury, and in rebuttal argument the prosecutor told the jury that it had a duty to accept the law as the judge stated it and "not to question the wisdom of the rule of law ... [you have] a duty to decline Mr. Farina's invitation to become a law unto yourselves." Defense counsel did not object to the prosecutor's remarks.

19. Thus, in *Dougherty, supra*, the United States Court of Appeals for the District of Columbia Circuit stated that:

> [I]t is pragmatically useful to structure instructions in such wise that a jury must feel strongly about the values involved in the case, so strongly that it must itself identify the case as establishing a call of high conscience, and must independently initiate and undertake an act in contravention of the established instructions. This requirement ... confines the happening of the lawless jury to the occasional instance that does not violate ... the overall normative effect of the rule of law.

154 U.S.App.D.C. at 99–100, 473 F.2d at 1136–37 (emphasis added) (footnote omitted). *See also Reale, supra*, 573 A.2d at 15; *Watts v. United States*, 362 A.2d 706, 710 n. 5 (D.C.1976) (en banc).

struction from the court." *Arshack, supra,* 321 A.2d at 851 (upholding trial court's refusal to give jury nullification instruction). *See also United States v. Washington,* 227 U.S.App.D.C. 184, 189, 705 F.2d 489, 494 (1983). *But see Dougherty, supra,* 154 U.S.App.D.C. at 104, 473 F.2d at 1141 (irrational not to inform jury of nullification power) (Bazelon, C.J., concurring in part and dissenting in part).

On appeal, appellants contend that without being informed of the option to go against the law, the jury may feel constrained or compelled to find a defendant guilty. However, the court has concluded that the practice of not informing the jury of its power to ignore the law "has not negated the jury's power." *Arshack, supra,* 321 A.2d at 845. *See Dougherty, supra,* 154 U.S.App.D.C. at 96, 473 F.2d at 1133 (rejecting argument that conscientious jurors may feel compelled to find guilt "to defer to an assumption of necessity that is contrary to reality"). The court has considered this issue many times and the law is clear.[20]

 Finally, appellants' contention that the trial judge's instructions constituted a directed verdict of guilt fails. Although, clearly, a judge may not direct a verdict against a criminal defendant, *Minor v. United States,* 475 A.2d 414, 416 (D.C. 1984) (citations omitted), an instruction that the jury "must" find the defendant guilty if it finds that the government has proved every element of the offense beyond a reasonable doubt is not a directed verdict, if given in the context of other instructions which inform the jury about the presumption of innocence, the government's burden of proving each element of the offense beyond a reasonable doubt, and other matters such as the fact that the jury must consider all the instructions given, as a whole. *Watts, supra,* 362 A.2d at 705–06, 709 (en banc); *see also Reale, supra,* 573

A.2d at 15 (permissible to tell jury it must convict if all elements of offense met) (citation omitted); *Dougherty, supra,* 154 U.S.App.D.C. at 100–101, 473 F.2d at 137–38 & n. 54 (rejecting argument that court directed verdict where jury instruction explicitly stated that defendant's motives for violating the law were no defense).

Accordingly, we affirm the judgments of conviction.

---

20. Appellants argue that New Hampshire has a better rule of allowing defense counsel to argue jury nullification to the jury, which appellants were not allowed to do in the trial court. Appellant Farina's attempt to do so was explicitly countered by the prosecutor's rebuttal argument. However, in the case on which appellants rely, the court states that a jury nullification instruction is not required and merely "further note[s]" that defense counsel was allowed to argue jury nullification in his closing argument. *State v. Mayo,* 125 N.H. 200, 480 A.2d 85, 87 (1984).