**In Re Prosecution of Emerson CRAWLEY.**

No. 09–SP–245.

District of Columbia Court of Appeals.

Argued June 2, 2009.
Decided Aug. 20, 2009.

Frederick D. Cooke, Jr., Washington, for Emerson Crawley.

Todd S. Kim, Solicitor General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Rosalyn Calbert Groce, Deputy Solicitor General, and Sidney R. Bixler, Assistant Attorney General, were on the brief, for the District of Columbia.

Roy W. McLeese III, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, was on the brief, for the United States.

Before GLICKMAN, KRAMER, and OBERLY, Associate Judges.

OBERLY, Associate Judge:

The Procurement Reform Amendment Act of 1998 ("the false claims statute") provides that anyone who submits a false claim to the District of Columbia shall be imprisoned not more than a year and fined not more than $100,000 for each violation. D.C.Code § 2–308.21 (except as otherwise indicated, we refer to the 2001 edition of the Code). The false claims statute vests the responsibility to enforce violations of this statute with the Office of the Attorney General for the District of Columbia ("the OAG"). The court must decide whether this assignment of prosecutorial authority is valid. We hold that it is not.

## I. Facts and Procedural History

Emerson Crawley, an employee of the District of Columbia Public Schools, allegedly sought to have the District reimburse as business expenses thousands of dollars that Crawley spent for his personal purposes. The District investigated Crawley, and referred the matter to the United States Attorney's Office for the District of Columbia ("the USAO"), which declined to prosecute him. The District, acting through the OAG, then charged Crawley by information with seventeen counts of violating the false claims statute. Pursuant to D.C.Code § 23–101(f), the trial court certified to this court the question whether the OAG has the authority to prosecute alleged violations of the false

claims statute. We expedited briefing and argument. See D.C.Code § 23–101(f).

## II. Discussion

### A. Statutory Overview.

#### 1. Division of Prosecutorial Authority.

Title 23, Section 101 of the D.C.Code "bifurcate[s]" the "prosecuting authority for crimes committed in the District." *United States v. Bailey*, 495 A.2d 756, 760 n. 10 (D.C.1985). As a general matter, the OAG "prosecutes only certain minor crimes, such as violations of municipal ordinances." *Id.* Specifically, D.C.Code § 23–101(a) provides:

Prosecutions for violations of all police or municipal ordinances or regulations and for violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year, shall be conducted in the name of the District of Columbia by the Corporation Counsel for the District of Columbia [now known as the OAG], except as otherwise provided in such ordinance, regulation, or statute, or in this section.

Section 23–101(b) empowers the OAG to prosecute, in addition to the crimes specified in Section 23–101(a), additional minor crimes—that is, violations "relating to disorderly conduct" and "lewd, indecent, or obscene acts."

"All other criminal prosecutions," Section 23–101(c) instructs, "shall be conducted in the name of the United States by the United States [A]ttorney for the District of Columbia or his assistants, except as otherwise provided by law." [1]

1. Notwithstanding the division of authority in Section 23–101(a) through (c), in certain circumstances, the USAO and the OAG may con-

sent to prosecution by the other of violations falling within their respective jurisdictions. Section 23–101(d), (e). For the convenience

This division of prosecutorial authority—roughly speaking, minor crimes to the OAG, and more serious matters to the USAO—is consistent with longstanding practice. More than 100 years ago, Congress provided:

> Prosecutions for violations of all police or municipal ordinances or regulations and for violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year, shall be conducted in the name of the District of Columbia and by the city solicitor [predecessor of the OAG] or his assistants. All other criminal prosecutions shall be conducted in the name of the United States and by the attorney of the United States for the District of Columbia or his assistants.

Act to Establish a Code of Law for the District of Columbia, ch. 854, § 932, 31 Stat. 1189, 1340–41 (1901).

The phrasing of the current version of Section 23–101 can be traced to the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473 (1970) ("the Court Reform Act"). The Court Reform Act refined the division of prosecutorial authority that had been made at the beginning of the century by breaking up the single paragraph above into the three subsections currently found at Sections 23–101(a) through (c). 84 Stat. at 604–05. In addition, the Court Reform Act established in Section 23–101(a) and (c) how deviations from those subsections could be made by adding the "except as otherwise provided" clauses. Thus, Section 23–101(a) says that exceptions to that subsection could be made by "ordinance, regulation, or statute," and Section 23–101(c) says that the rule of that section could be altered only by "law."

of the reader, the entire text of Section 23–101 is set forth as an appendix to this opinion.

## 2. The False Claims Statute.

The District's false claims statute, passed by the D.C. Council in 1998, makes it unlawful to "present[ ] to any officer or employee of the District of Columbia government, or to any department or agency thereof, any claim upon or against the District of Columbia, or any department or agency thereof, knowing such claim to be false, fictitious or fraudulent." D.C.Code § 2–308.21. The statute requires that "each violation" of Section 2–308.21 be punished by imprisonment of "not more than one year" and "a fine of not more than $100,000." *Id.* The statute assigns to the Corporation Counsel, the predecessor of the OAG, the duty to "prosecute violations of this section." *Id.*

## 3. The Home Rule Act and Its Limitations.

In 1973, more than seventy years after passage of the first statute dividing prosecutorial authority in the District, *see* 31 Stat. 1189, 1340–41 (1901), Congress passed the District of Columbia Home Rule Act ("the HRA"), 87 Stat. 777, Pub.L. 93–198, D.C.Code §§ 1–201.01 *et seq.* "[T]he core and primary purpose" of the HRA "was to relieve Congress of the burden of legislating upon essentially local maters 'to the greatest extent possible, consistent with the constitutional mandate.' " *McIntosh v. Washington,* 395 A.2d 744, 753 (D.C.1978) (quoting D.C.Code § 1–121(a) (1978 Supp.));[2] *accord District of Columbia v. Washington Home Ownership Council, Inc.,* 415 A.2d 1349, 1351 (D.C.1980) (en banc). To further this purpose, the HRA "extend[ed]" the "legislative power of the District ... to all rightful subjects of legislation within the District consistent with the Constitution of the United States." D.C.Code § 1–203.02. The HRA expressly grants the Council,

**2.** D.C.Code § 1–121 (1978) has been reenacted as D.C.Code § 1–201.02 (2001).

subject to a sixty-day period when Congress can nullify such legislation, the authority to enact "act[s], resolution[s], or rule[s] with respect to" Titles 22–24 of the Code—the titles pertaining to the District's substantive and procedural criminal law. D.C.Code § 1–206.02(a)(9), (c)(2). The HRA precludes the Council from "[e]nact[ing] any act or regulation ... relating to the duties or powers of the United States Attorney ... for the District of Columbia." D.C.Code § 1–206.02(a)(8).

**B. Analysis.**

 As described above, prosecutorial authority for crimes occurring in the District must be exercised in accordance with D.C.Code § 23–101(a) through (c). It is common ground among the parties that Section 23–101(a) cannot provide authority for the Council's purported assignment of the prosecutorial duty to the OAG.[3] Section 23–101(b) grants to the OAG the power to prosecute violations "relating to disorderly conduct" and "lewd, indecent, or obscene acts," and thus also cannot justify

the false claims statute. The question, therefore, is what Congress meant in Section 23–101(c) when it assigned prosecutorial responsibility for crimes not specified in Section 23–101(a) and (b) to the USAO *"except as otherwise provided by law."* The text, of course, is our main guide on this question of statutory construction. *Veney v. United States,* 936 A.2d 811, 822 (D.C.2007). But Justice Holmes' famous aphorism that "a page of history is worth a volume of logic," *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921), rings especially true in this case, so we begin with an overview of history that, as we shall see, helps to elucidate the meaning of the text that we consider.[4]

**1. A Brief History of the Evolution of the District's Government.**

**a. Background: District Government Pre–1970.**

"Between 1800 and 1871, the government in the District of Columbia was

**3.** To the extent that the District suggests that the assignment of prosecutorial authority in the false claims statute to the OAG is a valid exercise of the Council's power under Section 23–101(a), we reject that argument. First, we do not read the false claims statute as a "police or municipal ordinance[] or regulation[]" or a "penal statute in the nature of [a] police or municipal regulation[]." Section 23–101(a). Violators of the false claims statute face a penalty of up to $100,000 per violation and up to one year in jail; Crawley, charged with seventeen counts of violating the false claims statute, thus faces a fine of $1.7 million and 17 years in jail. It cannot seriously be said that this is a punishment in the nature of one that would flow from a violation of something akin to a police or municipal ordinance. Moreover, under Section 23–101(a), the Council may authorize the OAG to prosecute violations of "police or municipal ordinances" and "penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, *or* imprisonment not exceeding one

year." (emphasis added). Because the false claims statute authorizes a punishment of a fine *and* imprisonment, assigning prosecutorial authority to the OAG cannot be justified under Section 23–101(a).

**4.** A detailed discussion of the history of the District's government is beyond the scope of this opinion. For information on this engrossing topic, *see, e.g.,* CHARLES WESLEY HARRIS, CONGRESS AND THE GOVERNANCE OF THE NATION'S CAPITAL: THE CONFLICT OF FEDERAL AND LOCAL INTERESTS (1995); STAFF OF THE HOUSE COMMITTEE ON THE DISTRICT OF COLUMBIA, 101ST CONG. 2ND SESS., GOVERNANCE OF THE NATION'S CAPITAL: A SUMMARY OF THE FORMS AND POWERS OF LOCAL GOVERNMENT FOR THE DISTRICT OF COLUMBIA, 1790 TO 1973 (Comm. Print 1990); Gregory E. Mize, *A Guide to Deciphering the Laws of a Unique City–State Legislature–The Council of the District of Columbia,* 2 POTOMAC L.REV. 1 (1979); Jason I. Newman & Jacques B. DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self–Government Act,* 24 AM. U.L.REV. 537 (1975).

strictly municipal in its character." *Newspapers, Inc. v. Metropolitan Police Dep't,* 546 A.2d 990, 994 (D.C.1988) (internal quotation marks omitted). In 1871, Congress delegated its legislative authority over the District to the Legislative Assembly, which exercised "full legislative powers" similar to those currently exercised by the D.C. Council. *Id.* But three years later, the District's "corrupt and debt-ridden"[5] government was "head[ing] down the road to bankruptcy," and the Legislative Assembly experiment came to an end. Mize, *supra* note 4, at 7. Thus, in 1874, Congress repealed the Act creating the Legislative Assembly and established in its stead "a temporary three-member Board of Commissioners form of government for the District," which form was made "permanent in 1878." *Newspapers, Inc.,* 546 A.2d at 994.

With the repeal of the Act creating the Legislative Assembly, the "legislative powers" of the District had "ceased." *Newspapers, Inc.,* 546 A.2d at 994 (internal quotation marks omitted). The Board of Commissioners that assumed the Legislative Assembly's role was composed of " 'administrative officers with ministerial powers only.' " *Id.* (quoting *District of Columbia v. Bailey,* 171 U.S. 161, 176, 18 S.Ct. 868, 43 L.Ed. 118 (1898)). With time, "the Board of Commissioners became more than a mere administrative agency, possessing significant legislative authority obtained by a broad delegation of police power from Congress to 'promulgate reasonable and usual police regulations.' " *Newspapers, Inc.,* 546 A.2d at 995 (quoting *District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 111, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953)). Nonetheless, "the Board of Commissioners" never possessed "inherent legislative authority and Congress retained the plenary power to legis-late for the District of Columbia." *Newspapers, Inc.,* 546 A.2d at 995. "In short, the 1878 permanent form of D.C. government created an adjunct of the federal executive branch for administering the municipal affairs of the District of Columbia." Mize, *supra* note 4, at 8.

"In June, 1967," citing the District's " 'explosive growth,' " "President Lyndon B. Johnson proposed the creation of the District of Columbia Council to perform the ordinance-making functions thereto performed by [the] Board of Commissioners." Mize, *supra* note 4, at 9. President Johnson's plan did not disturb the "overall administrative authority and function of the 1878 government (with lack of sovereignty)." *Id.* at 10. Rather, the "Presidential reorganization merely divided and reassigned the executive management and delegated rulemaking power of the three Commissioners. Prior to 1967, such functions were shared equally by the three Commissioners." *Id.*

Under President Johnson's plan, "nine appointed District of Columbia Council members assumed the myriad of rulemaking powers which Congress, over the years, had delegated to the Board of Commissioners. Contemporaneously, one appointed commissioner became the solo implementer of the 1878 Board of Commissioner's executive management functions." Mize, *supra* note 4, at 10–11 (footnote call omitted). Because the changes merely shifted (without adding any new authority) the power that Congress to that point had delegated, prior to the HRA, "the District of Columbia Council had no more rulemaking power than that which was delegated to and exercised by the Board of Commissioners." *Id.* at 11.

Thus, in 1970, Congress acted as "the 'state' legislature as well as the national

---

5. Harris, *supra* note 4, at 5.

legislature for the District of Columbia as a 'territory.'" Mize, *supra* note 4, at 2. Accordingly, Congress legislated in the fields of "[c]riminal offenses, inheritance, commercial paper, and all other topics of 'general' law." *Id.* The Council, in contrast, as the "federally established city council for the District of Columbia as a municipality," was "merely authorized to adopt what are typically known as 'regulations,' but not 'statutes.'" *Id.* at 2, 11. Further, the regulations that the Council did have authority to enact were in "such areas as building codes, public health services, and welfare." Newman & DePuy, *supra* note 4, at 547; *see also* Mize, *supra* note 4, at 2 (pre-HRA, the Council promulgated "codes, licensing fees, traffic regulations, minor criminal offenses, and other typical 'local' laws") (footnote calls omitted); GOVERNANCE OF THE NATION'S CAPITAL, *supra* note 4, at 8 (describing Council's pre-HRA authority). In short, in 1970, the District was governed by "a corporate municipal government *devoid* of general lawmaking powers." Mize, *supra* note 4, at 11 (emphasis added) (footnote call omitted).

### b. The Home Rule Act and Beyond.

Although the HRA markedly expanded the Council's legislative authority, *see generally* Mize, *supra* note 4, there is no indication that in the specific field of designating prosecutors for crimes Congress intended to grant the Council a greater role than it had before the HRA. To the contrary, as one commentator observed, in the "crucial political struggle" preceding the passage of the HRA, "the residents of the federal district came very close to getting," but ultimately did not get, "some key powers that, with hindsight, would have made a major difference in District affairs. Control of the ... authority to appoint judges and prosecute local crimes are cases in point." HARRIS, *supra* note 4, at 10.

■ To make clear the Council's limited authority in the sphere of designating prosecutors of criminal offenses, the HRA expressly precluded the Council from enacting legislation "relating to the duties or powers of the United States Attorney ... for the District of Columbia." D.C.Code § 1–206.02(a)(8). As the Supreme Court has held, "the ordinary meaning of ['relating to'] is a broad one—to stand in some relation to; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (internal quotation marks omitted) (holding that a provision precluding states from enacting laws "'relating to rates, routes, or services of any air carrier' ... express[ed] a broad pre-emptive purpose"). Citing *Morales,* the United States contends that a "law granting the OAG authority to prosecute kinds of offenses that would otherwise be the responsibility of the USAO under the criteria established in § 23–101 would clearly 'relate to the duties or powers of the USAO.'" In view of the purposes of the HRA and the history of the District's government, we agree that the United States correctly interprets the congressional intent behind Section 1–206.02(a)(8).[6]

---

**6.** After *Morales,* the Court held that its "prior attempt to construe the phrase 'relate to' [did] not give [the Court] much help drawing the line" in another pre-emption case involving similar language. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Accordingly, the Court went "beyond the unhelpful text and the frustrating difficulty of defining its key term, and look[ed] instead to the objectives" of the statute under review to determine the scope of pre-emption. *Id.* at 656, 115 S.Ct. 1671. Likewise, our holding here does not

There is more. Since the passage of the HRA, "local officials" have lobbied for "a city prosecutor to take over local functions from the United States [A]ttorney for the District." HARRIS, *supra* note 4, at 212. The argument has been that "full control of the criminal justice system at the local level would contribute to its overall improvement." *Id.* The fact that local officials have felt it necessary to advocate for this point shows that these officials understand that under the HRA, the Council has no authority to tinker with the rule set out in Section 23–101(c). And the fact that the advocacy has been unsuccessful demonstrates that any interest Congress has on this point has not been a high priority.

The bottom line is that before, during, and after the passage of the HRA, it has been widely recognized that the Council lacks the authority to designate the OAG as the prosecutor of offenses that are not specified in Section 23–101(c). We see no reason today to break with this long-held consensus.[7]

### 2. Legislative History.

The legislative history supports our reading of Section 23–101(c). The House Report on the 1970 Court Reform Act— the Act that broke down into three paragraphs now found in Section 23–101(a) through (c) the division of prosecutorial authority that Congress first articulated in 1901—indicated that proposed Section 23–101 would "leave authority with the Corporation Counsel to prosecute minor offenses; the United States Attorney would continue to prosecute all felonies and the more serious misdemeanors." H.R. REP. No. 91–907, 91st Cong., 2d Sess. 169 (1970).[8]

Three years later, when Congress was considering Home Rule legislation, the proposed version of the HRA precluded the Council from "enact[ing] any act, or enact[ing] any act to amend or appeal [*sic* ] any Act of Congress, which concerns the functions or property of the United States." H.R. 9682, 93d Cong., § 602(a)(3) (Oct. 10, 1973), reprinted in 1 STAFF OF THE SENATE COMM. ON THE DISTRICT OF COLUMBIA, 93D CONG., 1ST SESS., LEGISLATIVE HISTORY OF DISTRICT OF COLUMBIA SELF-GOVERNMENT AND GOVERNMENTAL REORGANIZATION ACT 1335 (Comm. Print 1974) ("HRA HISTORY"). Some congresspersons, dissenting

---

turn on the text alone, but rather is informed by the objectives of the HRA and the history of the District's government.

7. Further, although Congress eventually agreed that the Council should have authority to amend Titles 22–24, the congressional review period for such legislation is sixty days—that is, thirty days longer than the review period for other Council legislation. *Compare* Section 1–206.02(c)(1) (describing approval period for ordinary legislation) *with* Section 1–206.02(c)(2) (describing approval period for legislation modifying Titles 22–24). This suggests that Congress believed that Council legislation on criminal matters strongly implicated federal interests, and that Congress intended jealously to protect those interests.

8. "No statute applicable to the District of Columbia provides a general definition of ei-

ther 'felony' or 'misdemeanor.' " *Henson v. United States,* 399 A.2d 16, 20 (D.C.1979) (explaining that "[l]argely for historical reasons, the courts in this jurisdiction generally define 'felony' as any offense for which the maximum penalty provided for the offense is imprisonment for more than one year; generally, all other crimes are misdemeanors"). As a result, it is not clear what Members of Congress had in mind in voicing their concern about preserving the USAO's authority to prosecute "serious" misdemeanors. Suffice it to say that the false claims statute, with its maximum penalty of one year in jail and $100,000 in fines for each violation, creates a "serious" misdemeanor on any view of that word. The District has not cited any misdemeanors that carry comparable penalties that are prosecuted by the OAG.

from the Committee Report on this version of the bill, thought it "totally unclear from the bill whether, for instance, if Title 22 of the D.C.Code were amended by the Council, the criminal action would thereafter be commenced in the name of the United States (which is now the case for all felonies and misdemeanors carrying a penalty of one year or more) or whether the action would be filed in the name of the District of Columbia." *Id.* at 1125.[9] The dissenters continued: "Inasmuch as the prosecution of all felonies and major misdemeanors are currently handled by the United States Attorney for the District of Columbia in the name of the United States (rather than the D.C. Corporation Counsel) this is an important and unresolved question in this bill." *Id.*

At the floor debate on H.R. 9682, Representative Harsha argued that under the proposed bill the possibilities that concerned the dissenters would not come to pass. Rep. Harsha said: "that language [meaning, Section 602(a)(3)] convinces me that under this bill all present functions undertaken by the U.S. Attorney would remain in that office and could be removed therefrom only by act of Congress." 2 HRA HISTORY. at 1251.[10] Rep. Harsha argued that "any act to amend the laws relating to the jurisdiction of the U.S. Attorney for the District of Columbia is an act 'which concerns that function—of the

United States.'" *Id.* It followed, Rep. Harsha reasoned, that "[u]nder section 602(a)(3) of H.R. 9682, the Council could not enact legislation affecting the balance of prosecutorial responsibilities between the U.S. Attorney and the Corporation Counsel because it would be altering a 'function' of the United States." *Id.* at 1252. Rep. Adams, a cosponsor of the bill, and "a strong proponent of self-government," Newman & DePuy, *supra* note 4, at 557, "agree[d]" with Rep. Harsha's interpretation. 2 HRA HISTORY, at 1252. Moreover, "[t]o make it very clear," Rep. Adams said that an amendment had been proposed that would clarify that the Council was to have "no authority to . . . [e]nact any act or regulation . . . relating to the duties or powers of the United States attorney . . . for the District of Columbia." *Id.* "And it is the intent of that section," Rep. Adams explained, "that the present prosecutive operation remain as it is until the Congress of the United States in its wisdom changes it." *Id.*

After Rep. Adams described the proposed amendment, Rep. Harsha asked: "Then I am correct in this assumption, that in either bill we are talking about which was reported out of the Committee on the District of Columbia there is no intent whatsoever to change the present jurisdiction of the Attorney General's office or the Justice Department in its prose-

---

9. The bill under consideration at the time would have prevented the Council from ever amending Title 22. *See infra* at 15–16, 2 HRA HISTORY at 1336. As a result, it appears that the legislators might have been laboring under a misunderstanding of the bill when they wondered what would happen if the Council were to amend that Title. On the other hand, it is possible that they were aware that a later draft of the HRA would not preclude the Council's authority forever to amend Titles 22–24, and that the comments cited above were made in anticipation of that later version of the bill.

10. The District argues that Rep. Harsha's use of the words "present functions" means that Congress did not intend the limitation in Section 1–206.02(a)(8) to apply to "new" criminal offenses enacted by the Council. This argument tracks the District's contention that the phrase "duties and powers" in Section 1–206.02(a)(8) refers solely to the USAO's duties and powers in 1973. As we shall explain later, this is not a plausible reading. *See infra* at 17–18.

cutorial efforts in dealing with the courts and crime in the District of Columbia?" 2 HRA HISTORY, at 1252. Rep. Adams answered: "That is correct. Neither bill changes that operation in the District of Columbia." *Id.*

Ultimately, the HRA contained both provisions that Reps. Adams and Harsha discussed. Section 1–206.02(a)(3) precludes the Council from "enact[ing] any act, or enact[ing] any act to amend or repeal any Act of Congress, which concerns the functions or property of the United States." And Section 1–206.02(a)(8), as we have seen, precludes the Council from "enact[ing] any act or regulation . . . relating to the duties or powers of the United States Attorney . . . for the District of Columbia."

The District rightly points out that at the time that Reps. Adams and Harsha discussed limitations on the Council's authority to alter the responsibilities of the USAO, the bill under consideration would have precluded the Council from ever amending Titles 22–24 of the D.C.Code— the titles governing substantive and procedural criminal law. 2 HRA HISTORY, at 1335–36. The version of the bill that was ultimately adopted, however, expressly permitted the Council, upon the passage of two years after the Council took office, to amend Titles 22–24.[11] Rep. Diggs, the Chairman of the House Committee on the District of Columbia, explained the motivation for the change:

> The House passed bill prohibited the Council from making any changes in Titles 22, 23 and 24 of the D.C.Code. It was felt that since the District criminal code has not been substantially reviewed and revised for more than seventy years, this provision would hamper con-

structive revision of the criminal code. Since the District Committee is expected to act in the very near future on H.R. 7412, a bill which I introduced to create a law revision commission for the District, the Conference compromise was adopted. The law revision commission will be given a mandate to turn initially to revision of the D.C. Criminal Code and report its recommendations to the Congress. The Congress will then have a chance to make the much needed revision of the criminal code. This should take no longer than two years. Subsequent to that action, it seems appropriate and consistent with the concept of self-determination, that the Council be given the authority to make whatever subsequent modifications in the criminal code as are deemed necessary.

4 HOME RULE FOR THE DISTRICT OF COLUMBIA 1973–1974: BACKGROUND AND LEGISLATIVE HISTORY OF H.R. 9056, H.R. 9682, AND RELATED BILLS CULMINATING IN THE DISTRICT OF COLUMBIA SELF-GOVERNMENT REORGANIZATION ACT, HOUSE COMMITTEE PRINT, 93D CONG., 2D SESS. 3041–42 (1974).

The District's argument is well-taken. Congressional views about the Council's authority to designate the prosecutors of crimes likely would have been more restrictive when Congress would not have allowed the Council to amend the criminal laws at all. It does not follow, however, that when Congress agreed to permit the Council to make changes to Titles 22–24 (subject, of course, to the sixty-day review period of Section 1–206.02(c)(2)), Congress also intended to allow the Council to alter the criteria that had governed prosecutorial authority since the beginning of the century.

---

11. *See McIntosh,* 395 A.2d at 750 n. 12 (noting that in 1976, Congress amended the predecessor of Section 1–206.02(a)(9) to "extend [that] section's time prohibition" from two years to four years).

The problem for the District is that although its criticisms of the position of the United States have some force, the District can point to nothing in the legislative record showing that anyone believed that the Council could alter the rule of Section 23–101(c). "Congressional silence" in this regard is "surely probative" because despite the fact that allowing the Council to alter the District's prosecutorial authority would mark a dramatic change in established law, "nowhere in the course of Congress' lengthy deliberations is there any hint that Congress wanted" to achieve this goal. *City of Rancho Palos Verdes, Cal. v. Abrams,* 544 U.S. 113, 132, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (Stevens, J., concurring). "[J]udges, as well as detectives, may take into consideration the fact that a watchdog did not bark in the night." *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 602, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (Rehnquist, J., dissenting). Here, Congress's silence supports the view that in assigning to the OAG the power to prosecute violations of the false claims statute, the Council exceeded its authority and acted inconsistently with the congressional will.

### 3. The District's Arguments.

We shall now explain why the District's approach fails to persuade us. According to the District, "when the Council creates a new offense, it can assign OAG responsibility for prosecuting it." In the District's view, the HRA's limitation on Council legislation "relating to the duties or powers of the United States Attorney ... for the District of Columbia," Section 1–206.02(a)(8), is not a barrier to this reading because that limitation applies only to those duties or powers that existed when the HRA was passed. If a crime did not yet exist when Congress passed the HRA, the argument goes, then the USAO had neither the duty nor the power to prose-

cute that crime. And if that is right, then the Council's decision to assign authority to prosecute violations of the new crime to the OAG would not "relate" to the duties or powers of the USAO. To decide whether a crime is "new" under this framework, the District suggests applying the test that the Supreme Court articulated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), "to determine," for Double Jeopardy purposes, "whether there are two offenses or only one." The District contends that under *Blockburger,* the false claims statute established a new crime, and therefore the Council acted within its authority by assigning prosecutorial authority over this crime to the OAG.

We believe this is an implausible reading of the statutory scheme. The District observes that neither the HRA nor Section 23–101 explicitly say that only Congress can alter the balance established in Section 23–101(c). That may be, but those provisions really do not say what the District says they do. The District protests that "[i]t stretches language too far ... to suggest that" in Section 1–206.02(a)(8) "Congress was referring to a *potential* 'duty' or 'power' to prosecute crimes that did not even exist." We disagree. As the United States puts it, "it is very natural to speak of having general duties that will apply in future contexts. For example, someone who takes an oath to uphold and defend the Constitution will surely have the duty to uphold and defend constitutional amendments enacted after the oath is taken." This strikes us as absolutely right. If Congress had intended to allow the Council to deviate from the requirements of Section 23–101(c), we believe it would have done so more directly than through the elaborate mechanism suggested by the District. Simply put, there is nothing either in logic or in the text, structure, or

legislative history of Section 1–206.02(a)(8) that supports the District's claim that Congress intended to fix in time the "duties and powers" of the USAO.

The District also argues that because the Council has authority to add criminal offenses, it follows that the Council can provide for the prosecution of those offenses as it sees fit. In other words, if by enacting new crimes the Council does not run afoul of the "relating to" limitation, how can choosing the prosecutor of those new crimes be improper? This argument fails for the simple reason that the HRA explicitly permits the Council to amend Titles 22–24, and thereby to enact new offenses and repeal old ones. Section 1–206.02(a)(9); *McIntosh*, 395 A.2d at 750–53. Put differently, it is not that legislation creating new criminal offenses does not relate to the duties and powers of the USAO—it does. The reason such legislation is permissible nonetheless is that it is expressly authorized by Section 1–206.02(a)(9), and it would be odd to read the limitations of Section 1–206.02(a)(8) to override that grant of authority. By contrast, there is no parallel provision explicitly allowing the Council to designate prosecutors of new offenses. Therefore, the fact that the Council may create new offenses does not mean that the Council may designate the prosecutors of those offenses without running headlong into the "relating to" limitation.

The District makes much of a number of this court's prior decisions interpreting other provisions of the HRA, primarily the HRA's bar on Council legislation "with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." Section § 1–206.02(a)(4). *District of Columbia v. Sullivan*, 436 A.2d 364 (D.C.1981), is illustrative. *Sullivan* concerned the Traffic Adjudication Act of 1978, which decriminalized certain traffic offenses and provided that appeals from some civil traffic administrative adjudications should be taken to the Superior Court instead of this court, as Congress had initially designated. *Id.* at 364–65. We upheld the Traffic Act against an HRA challenge. *Id.* at 365.

*Sullivan* does not command a different result here, nor do the other cases cited by the District.[12] For the reasons discussed above, there is good indication that even as the District's authority to legislate upon "essentially local matters," *Sullivan*, 436 A.2d at 366 (internal quotation marks omitted), evolved, Congress never wished to take away from the USAO that office's

---

**12.** For other such cases, *see Dimond v. District of Columbia*, 253 U.S.App. D.C. 111, 121–22, 792 F.2d 179, 189–90 (1986) (upholding District of Columbia Compulsory/No–Fault Motor Vehicle Insurance Act of 1982, which defined Superior Court's "jurisdiction in automobile accident tort cases to extend only to cases where $5,000 in medical expenses have been incurred," against argument that this act violated the HRA's restriction on Council legislation relating to the organization and jurisdiction of the District of Columbia Courts); *Hessey v. Burden*, 584 A.2d 1 (D.C.1990) (holding that initiative that would have enlarged the class of persons who would bring appeals to the Tax Division of the Superior Court would not violate the predecessor version of Section 1–206.02(a)(4)); *District of Columbia v. Greater Wash. Cent. Labor Council, AFL–CIO*, 442 A.2d 110, 117–18 (D.C.1982) (act "vesting the Superior Court with the right to enforce compensation awards and this court with the authority to review final compensation orders" did not violate the predecessor version of Section 1–206.02(a)(4), because the power to enforce compensation orders "f[e]ll within the equitable jurisdiction presently vested in the Superior Court" and this court likewise already had jurisdiction over appeals in such cases); *see also McIntosh*, 395 A.2d 744 (construing the predecessor version of Section 1–206.02(a)(9), which permits the Council to enact new criminal offenses, and holding that Firearms Control Regulations Act of 1975 was valid exercise of Council's authority).

historic responsibility to prosecute virtually all criminal offenses, or to enlarge the OAG's role in doing the same. The limitations of Section 1–206.02(a)(8) must be understood in that context.

By contrast, as *Sullivan* explains, the limitation upon the Council's ability to legislate with respect to the District's courts was enacted "to give the newly enacted [Court Reform Act] an opportunity to prove its effectiveness." *Sullivan*, 436 A.2d at 366 (footnote call omitted). It is with that purpose in mind that a congressman remarking on Section 1–206.02(a)(4) explained that "the purpose of this (provision) was the very strong argument made by the court and supported by members of the bar that the [Court Reform Act] had just gone into effect. Therefore, the *structure* of the courts should have an opportunity for [that Act] to be completely carried out." *Sullivan*, 436 A.2d at 366 (internal quotation marks omitted); *see also Palmore v. United States*, 411 U.S. 389, 393 n. 3, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (describing the evolution of the District's judiciary). And it is that context that helps to explain why *Sullivan* upheld the Traffic Act's modification of a judicial review mechanism that Congress had established.[13]

Because of the different purposes served by Section 1–206.02(a)(4) and (a)(8), it makes no sense to judge the latter by the criterion *Sullivan* applied to the former—i.e., to have the determination whether the Council impermissibly intruded upon the USAO's role turn on whether Council legislation affected the "structure," *Sullivan*, 436 A.2d at 366, of the USAO. The HRA was borne of an "intricate and inevitable process of political compromise," and "[a]s

a result, many of the drafters chose to sacrifice legal precision when protracted debate would have impeded passage of the Act." Newman & DuPuy, *supra* note 4, at 540. But nothing in the HRA's ambiguities suggests that Congress intended to give the OAG a chance to step in the shoes previously filled by the USAO in a similar way that Congress wished to allow the local courts to prove their mettle with respect to work previously handled by certain federal courts.

Moreover, the Council legislation that we consider here is unique in kind. Cases like *Sullivan* discussed the Council's authority to allocate power within the local government—for instance, by providing which of the local courts have jurisdiction over a class of cases. In other words, in cases such as *Sullivan* it was a given that the District had power in a certain field, and the only question was who within the District could exercise that power. Thus, those cases at most provide support for a Council act similarly shifting prosecutorial authority *within* the District; consider, for example, a Council act creating a new prosecutor of disorderly conduct cases, which currently the OAG prosecutes pursuant to Section 23–101(b).

What makes the false claims statute different is that it purports not merely to shift authority within the local government, but to grant power to the District government to exercise authority that only the federal government previously had. The relevant parallel, therefore, would be to a Council act attempting to grant to the D.C. Superior Court jurisdiction over cases that the federal District Court traditionally had exclusive jurisdiction to adjudicate. Our decisions have never suggested that

13. *Sullivan's* holding that the Council had authority to decriminalize certain traffic offenses is a straightforward application of the HRA's explicit grant (in Section 1–206.02(a)(9)) to the Council of the power to amend substantive and procedural criminal law. Thus, that aspect of the decision does not support the District's argument either.

the Council has authority to promulgate such an act, and therefore those cases do not support the District's position here.

Finally, in support of its fallback positions, the District points out that Congress repeatedly gave the OAG authority over certain minor crimes that carried as punishment both jail time and a fine. *See District of Columbia v. Grimes,* 131 U.S.App. D.C. 360, 363–64, 404 F.2d 1337, 1340–41 (1968). Moreover, the District claims, "[o]n at least seven separate occasions, Congress ... passed laws affirming OAG authority to prosecute the making of false representations to the District government in various substantive contexts even where both a fine and imprisonment was authorized." The District reasons that these past decisions by Congress demonstrate that Congress intended to endow the Council with authority to assign to the OAG the power to prosecute, if not all "new" crimes (including, as per the District's broader argument, felonies), then misdemeanors that provide for both imprisonment and a fine. Or, narrower still, the District argues that the Council should be allowed to pass laws granting to the OAG authority to prosecute "local" misdemeanors.

■ These arguments are narrower, but analytically they are as flawed as the District's broader contention. In the statutes that the District cites, it was Congress that made the exceptions, and what Congress has done and what it remains free to do in this field are not probative of the Council's legislative authority. This is because the Constitution vests Congress with "extraordinary and plenary power ...

over the District." *United States v. Cohen,* 236 U.S.App. D.C. 36, 48, 733 F.2d 128, 140 (1984) (en banc) (Wilkey, J., concurring); *see also Palmore,* 411 U.S. at 396, 93 S.Ct. 1670 (citing Art. I., § 8, cl. 17). Moreover, Congress "continues to enjoy abundant power over the District" even after the passage of the HRA. *McClough v. United States,* 520 A.2d 285, 290 (D.C.1987). By contrast, the Council, as this case well illustrates, is constrained by the HRA. *See id.;* Section 1–206.01 (Congress has "reserve[d] the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council"); Newman & DePuy, *supra* note 4, at 548 (stating that the HRA "contains significant limitations"). Therefore, earlier congressional legislation granting the OAG authority to prosecute minor crimes does not support the Council's ability likewise to make exceptions to the USAO's jurisdiction.

### III. Conclusion

For the reasons explained above, we hold that only Congress can alter the prosecutorial authority described in Section 23–101(c), be it for felonies, misdemeanors, or other crimes that fall within that subsection. It follows that the Council exceeded its authority by assigning to the OAG the power to prosecute violations of the false claims statute. We therefore remand the case to the Superior Court for proceedings consistent with this opinion.[14]

14. Crawley asks us to order the information filed against him to be dismissed with prejudice. The OAG does not respond to this request, but the USAO argues that dismissal with prejudice is inappropriate "because the defect in this prosecution might well be remediable" under Section 23–101(d) and (e), which permit the USAO or the OAG to consent to prosecution by the other in certain circumstances. Having answered the question certified to us by the trial court—that is, whether the Council validly assigned to the OAG the duty to prosecute violations of the false claims statute—we believe that the best

*So ordered.*

## APPENDIX

D.C.Code § 23–101 (2001) provides in full as follows:

(a) Prosecutions for violations of all police or municipal ordinances or regulations and for violations of all penal statutes in the nature of police or municipal regulations, where the maximum punishment is a fine only, or imprisonment not exceeding one year, shall be conducted in the name of the District of Columbia by the Corporation Counsel for the District of Columbia or his assistants, except as otherwise provided in such ordinance, regulation, or statute, or in this section.

(b) Prosecutions for violations of section 6 of the Act of July 29, 1892 (D.C. Official Code, sec. 22–1307), relating to disorderly conduct, and for violations of section 9 of that Act (D.C. Official Code, sec. 22–1312), relating to lewd, indecent or obscene acts, shall be conducted in the name of the District of Columbia by the Corporation Counsel or his assistants.

(c) All other criminal prosecutions shall be conducted in the name of the United States by the United States attorney for the District of Columbia or his assistants, except as otherwise provided by law.

(d) An indictment or information brought in the name of the United States may include, in addition to offenses prosecutable by the United States, offenses prosecutable by the District of Columbia, and such prosecution may be conducted either solely by the Corporation Counsel or his assistants or solely by the United States attorney or his assistants if the other prosecuting authority consents.

(e) Separate indictments or informations, or both, charging offenses prosecutable by the District of Columbia and by the United States may be joined for trial if the offenses charged therein could have been joined in the same indictment. Such prosecution may be conducted either solely by the Corporation Counsel or his assistants or solely by the United States attorney or his assistants if the other prosecuting authority consents.

(f) If in any case any question shall arise as to whether, under this section, the prosecution should be conducted by the Corporation Counsel or by the United States attorney, the presiding judge shall forthwith, either on his own motion or upon suggestion of the Corporation Counsel or the United States attorney, certify the case to the District of Columbia Court of Appeals, which court shall hear and determine the question in a summary way. In every such case the defendant or defendants shall have the right to be heard in the District of Columbia Court of Appeals. The decision of such court shall be final.

approach is to allow the trial court to determine in the first instance what should happen next. *See Grimes,* 131 U.S.App. D.C. at 361–62, 404 F.2d at 1338–39 (after answering certified question as to whether OAG's predecessor or USAO was proper prosecutor of disorderly conduct case, remanding "for whatever further action, consistent with this opinion, is necessary").