*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-1642

SCOTT J. MYERSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CMD-5142-12)

(Hon. Juliet J. McKenna, Trial Judge)

(Submitted February 20, 2014                    Decided August 28, 2014)

*Jeffrey L. Light* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney, *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Damien Diggs*, and *Peter S. Smith*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Associate Judge*, and PRYOR and KING, *Senior Judges*.

BLACKBURNE-RIGSBY, *Associate Judge*: Appellant Scott Myerson was convicted of misdemeanor assault on a police officer ("APO").[1] On appeal, appellant argues that the criminal information should have been dismissed because: (1) the APO statute, as applied to him, exceeds the Council of the District of Columbia's ("Council") authority under the Home Rule Act;[2] and (2) the government's failure to timely present a witness at trial violated his Sixth Amendment rights.[3] We affirm.

---

[1] D.C. Code § 22-405 (b) (2012 Repl.) (making it a misdemeanor to, "without justifiable and excusable cause, assault[], resist[], oppose[], impede[], intimidate[], or interfere[] with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties").

[2] D.C. Code § 1-206.02 (a)(3) (2012 Repl.).

[3] Appellant also argues that the trial court abused its discretion by refusing to admit a police report of an eyewitness statement under the "residual exception" to the hearsay rule. This claim can be dismissed summarily because we do not recognize the residual exception and, even if we did and applied it to this police report, the report would still be inadmissible as double hearsay. *See Evans-Reid v. District of Columbia*, 930 A.2d 930, 944 (D.C. 2007) ("Statements in a police report which are based on what the officer was told by others are just as much hearsay as if stated on the witness stand by the officer himself." (citation omitted)).

# I.    Factual Background

On March 25, 2012, at approximately 3:00 p.m., United States Park Police Officers Michael Blake and Carl Hiott were effectuating the arrest of a pedicab[4] driver for refusing to move his pedicab from a handicapped parking space, located on the 1000 block of Madison Drive, Northwest, next to the National Capitol Mall, when appellant rode his own pedicab to the scene, grabbed the other pedicab by the handlebar, and began towing it away.  The officers ordered appellant to release the other driver's pedicab and leave the scene.  Appellant released the pedicab but confronted the officers and "began arguing" with Officer Blake.  Officer Blake instructed appellant to "move along and leave the area" several times, but each time appellant parked his pedicab in a no parking zone on Madison Drive.

Officer Blake informed him that he was being issued a "notice of infraction," which caused appellant to become "very agitated" and "scream[] at the top of his lungs."  Appellant also "pulled out his cell phone and held it in front of [Officer Blake's] face."  Officer Blake ordered appellant "to put his phone

---

[4]  A "pedicab" is defined as "a tricycle with a 2-seat passenger compartment covered by a usually folding top and a separate seat for a driver who pedals." *Pedicab Definition*, Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/pedicab (last visited July 9, 2014).

away[,]" but appellant refused to comply. As a result, Officer Blake told appellant that he was under arrest for failing to obey a lawful order and to put his hands behind his back.

Officer Blake placed appellant's left hand behind his back, while Officer Hiott did the same with his right hand. As Officer Blake placed handcuffs on appellant's left wrist, but before cuffing his right wrist, appellant "began resisting, and aggressively pulled his right arm free." In response, Officer Blake forced appellant to the ground, and placed the handcuff on his right wrist. Officer Blake injured his knee as a result of this scuffle, which he later had treated at a hospital. After the arrest, the officers were approached by James Fritts, a visiting police officer from Wilson Borough, Pennsylvania, who claimed to have seen the events and voluntarily gave the officers his statement.

Appellant was charged by criminal information on March 26, 2012. Trial was originally set for June 1, 2012. On May 3, 2012, appellant filed an application with the trial court to subpoena Fritts, which was granted on May 11. However, Fritts "refused to talk to [appellant's counsel] . . . [and was] only willing to talk to the [prosecution.]" When appellant asked the government for Fritts' address to serve his subpoena, the government refused to provide it, but expressed its

intention to subpoena Fritts as a government witness. Relying on this representation, appellant no longer pursued his own subpoena. Appellant did not notify the trial court of this matter.

Prior to the trial date, appellant moved to dismiss the information, *see* Super. Ct. Crim. R. 12, arguing that the APO charge, as applied to him, exceeded the Council's authority under the Home Rule Act, because he was arrested by *federal* officers on *federal* park land. At a status conference on May 24, 2012, the trial court denied the motion, finding "no basis" to find the APO statute violative of the Home Rule Act. Additionally, the trial court issued a continuance so that the parties could respond to the court's request for additional briefing on one of appellant's discovery requests.[5] Appellant asserted his speedy trial rights and requested the case not be continued, but the trial court overruled the objection, considering it a joint continuance since it was issued to allow both parties an opportunity to respond to appellant's discovery request, and a new trial date was set.[6]

---

[5] The issue upon which the court asked for further briefing is not relevant on appeal.

[6] The trial date was initially rescheduled for July 26, 2012, but the government requested an additional continuance to procure certain relevant evidence. Appellant again objected, asserting his Sixth Amendment speedy trial

(continued. . .)

Prior to the new trial date, the case was assigned to a new prosecutor, who did not present Fritts as a witness on the day of trial. Appellant alleged that this amounted to a violation of his Sixth Amendment right to compel witnesses to appear in his defense. The trial court took a brief recess to allow the prosecutor to contact Fritts and discuss the matter further. Upon reconvening, the prosecutor notified the trial court that at some point before he was assigned the case, his predecessor contacted Fritts to let him know that his appearance would not be necessary. While he noted that Fritts would be "a strong witness" for the government, the prosecutor expressed his willingness to agree to a continuance to produce Fritts per appellant's request. Appellant rejected the offer for a continuance, once again asserting his speedy trial right, and moved for either dismissal of the charge or a missing-witness instruction. The trial court denied the motion to dismiss, noting that (1) it was ultimately appellant's responsibility to ensure the appearance of his own witnesses, (2) appellant had not confirmed that Fritts would be present when it learned that a new prosecutor had been assigned to the case, and (3) appellant had not notified the trial court of any of his difficulties in executing the subpoena, or that he was relying on the government to produce Fritts. The trial court also denied his alternative request for a missing-witness

_____

(. . .continued)
right. The trial court overruled the objection and this time rescheduled the trial for September 19, 2012.

instruction, finding that Fritts was not "unavailable given the representation that [the prosecutor] has just made about his willingness to make efforts to secure [Fritts'] presence, and that, as a resident of Pennsylvania, Fritts was not 'peculiarly within the control of the Government so that [appellant] would have been unable to secure [his] presence.'" Appellant was subsequently found guilty after a bench trial and this appeal followed.

## II.    Discussion

### A. APO Statute

On appeal, appellant first argues that the charge of misdemeanor APO violated the Home Rule Act because, since this case involved United States Park Police officers, rather than the Metropolitan Police Department, the Council had no legal authority to criminalize appellant's conduct directed towards *federal* law enforcement. In appellant's view, the charge is invalid as applied to him because it would infringe on a restricted "federal function." *See* D.C. Code § 1-206.02. We disagree.

"We apply a *de novo* standard of review to issues of statutory interpretation." *Porter v. United States*, 769 A.2d 143, 148 (D.C. 2001) (citation omitted). The issue of whether the Council had the authority to criminalize appellant's conduct directed towards *federal* police officers is a question of law. *See Farina v. United States*, 622 A.2d 50, 61 (D.C. 1993).

Under the Home Rule Act, Congress delegated broad power to the Council to enact local laws, subject to certain limitations. D.C. Code §§ 1-206.01 to -206.04 (2012 Repl.). Specifically, "[t]he Council shall have no authority to pass any act contrary to the provisions of this chapter except as specifically provided in this chapter, or to . . . [e]*nact any act*, or enact any act to amend or repeal any Act of Congress, which concerns the *functions or property of the United States*," D.C. Code § 1-206.02 (a)(3) (emphasis added), i.e., the Council cannot pass laws which affect a "federal function."

Our APO statute originates from a 1953 congressional act,[7] which preceded passage of the Home Rule Act in 1973. The Omnibus Public Safety Amendment Act of 2006, enacted by the Council, replaced the original APO statute, which had

---

[7] The District of Columbia Law Enforcement Act of 1953, Pub. L. No. 85, § 205, 67 Stat. 90, 95 (1953).

only included a felony offense, with the current language that provides for both a felony and a misdemeanor charge. D.C. Council, Report on Bill 16-247 at 2, 18 (Apr. 28, 2006). The 2006 amendment of the APO statute does not in and of itself exceed the Council's authority because the Home Rule Act "explicitly permits the Council to amend Titles 22-24, and thereby to enact new offenses and repeal old ones." *In re Crawley*, 978 A.2d 608, 618 (D.C. 2009); *see also* D.C. Code § 1-206.02 (a)(9); *McIntosh v. Washington*, 395 A.2d 744, 754 (D.C. 1978).

Nor are we persuaded by appellant's broad interpretation that United States Park Police necessarily carry out a "federal function" under the Home Rule Act.[8] The term "federal function" is narrowly construed and only pertains to those activities that explicitly impact the federal government's ability to operate. *See District of Columbia v. Greater Wash. Cent. Labor Council, AFL-CIO*, 442 A.2d 110, 116 (D.C. 1982) ("We are not persuaded that Congress intended that

---

[8] To the extent that appellant also argues that the location of the arrest, the 1000 block of Madison Drive, is "federal park land," or that the officers were "administrat[ing] . . . federal park areas[,]" the record shows, instead, that the officers were enforcing District of Columbia traffic laws on a District of Columbia street. We agree with the government that the facts of this case evidence a "purely *local* matter." The Council's police power is, at its core, the enforcement of District of Columbia substantive criminal law, regardless of the location of the arrest in question. *See Farina*, *supra*, 622 A.2d at 61 (affirming the convictions of demonstrators under the D.C. Code for blocking streets on the Capitol grounds, i.e., federal land policed by federal officers).

performance of a *local* function by federal officials . . . would transform the function into a 'function of the United States' for the purpose of [§ 1-206.02]." (emphasis added)). The enforcement of traffic laws on a local street is not a "federal function." *See In re Crawley*, *supra*, 978 A.2d at 610 ("The core and primary purpose of the [Home Rule Act] was to relieve Congress of the burden of legislating upon essentially local matters to the greatest extent possible, consistent with constitutional mandates." (citations, internal quotation marks, and alterations omitted)); *see also* 18 DCMR § 2406 (authorizing the Director of Public Works to place "signs prohibiting parking" on local streets).

Applying our narrow construction of "federal function" here, the United States Park Police officers' were effectuating a local function, and enforcement of the APO statute in relation to their performance of this local function did not interfere with "the integrity of the federal domain as it relates to administration of federal legislation having national implications." *Greater Wash. Cent. Labor Council, AFL-CIO*, *supra*, 442 A.2d at 116. Specifically, Officers Blake and Hiott were enforcing District of Columbia traffic laws on a local street when they encountered appellant, namely, directing traffic flow on Madison Drive. The officers' instructions directing appellant to remove himself from the scene and to refrain from parking in restricted areas also concerned the enforcement of District

of Columbia traffic laws. *See* 18 DCMR § 2000.2 ("No person shall fail or refuse to comply with any lawful order or direction of any police officer, police cadet, or civilian crossing guard invested by law with authority to direct, control, or regulate traffic."). Because the officers were effectuating purely local laws at the time of the incident, the APO charge did not violate the Home Rule Act. Accordingly, the trial court did not err in denying the motion to dismiss on this basis.

## B. Sixth Amendment Claims

Appellant next argues that the trial court's decision to deny his second motion to dismiss and, alternatively, his request for a missing-witness instruction on the day of trial violated his Sixth Amendment rights. Specifically, he contends that "by failing to compel the government to produce Mr. Fritts at trial," the trial court forced him to choose between his right to a speedy trial and his right to compulsory process for obtaining witnesses.[9] To determine whether the trial court erred, we examine whether either of appellant's asserted Sixth Amendment rights were actually violated.

---

[9] In support of this claim, appellant points to *Simmons v. United States*, 390 U.S. 377, 394 (1968), where the Supreme Court held that a criminal defendant's pretrial suppression hearing testimony could not be used against him at trial, as it would have put his Fourth Amendment right to be free from unreasonable search and seizure at odds with his Fifth Amendment right to remain silent at trial.

### 1. Speedy Trial Right

"It is axiomatic that 'the right to a speedy trial is a fundamental constitutional right'" under the Sixth Amendment. *Hartridge v. United States*, 896 A.2d 198, 207 (D.C. 2006) (citation omitted). However, "[t]he right of a speedy trial is necessarily relative." *Barker v. Wingo*, 407 U.S. 514, 522 (1972) (citation omitted). Speedy trial claims are reviewed against four factors: (1) the "[l]ength of delay, [(2)] the reason for the delay, [(3)] the defendant's assertion of his right, and [(4)] prejudice to the defendant." *Graves v. United States*, 490 A.2d 1086, 1090-91 (D.C. 1984) (en banc), *partially overruled on other grounds by United States v. Loud Hawk*, 474 U.S. 302 (1986) (quoting *Barker*, *supra*, 407 U.S. at 530). Viewing the record, a balancing of the *Barker* factors reveals no violation of appellant's speedy trial rights.

In this case, the information against appellant was filed on March 26, 2012, and the trial court held a hearing on May 24, 2012, to discuss appellant's first motion to dismiss. *Ward v. United States*, 55 A.3d 840, 844 (D.C. 2012) ("[T]he clock starts with 'either a formal indictment or information . . .' and stops when *pre-trial motions hearings commence*." (emphasis added) (citations omitted)). This constituted approximately two months, which is not generally considered an

unreasonable "delay." *See, e.g.*, *Hartridge*, *supra*, 896 A.2d at 208 ("We regard a delay of 'a year or more' to be prima facie evidence of a speedy trial violation, which creates a presumption of prejudice to the defendant." (citation omitted)); *Graves*, *supra*, 490 A.2d at 1091 & n.7 ("While the 25-month delay was substantial, . . . delays of roughly that length and longer have been countenanced by this court when all factors were considered."). Nor do any of the other factors weigh in appellant's favor. Neither party disputes that appellant properly asserted his right to a speedy trial. Further, the reasons proffered for the continuances indicate that they either aided appellant in his discovery requests, or were granted for otherwise "neutral" or "valid" reasons that do not support or weigh in favor of appellant's speedy trial claim. *See Diggs v. United States*, 28 A.3d 585, 600 (D.C. 2011) (holding that delays for valid or neutral reasons such as difficulties with scheduling and locating witnesses make a Sixth Amendment violation less likely). Finally, appellant presents no evidence to support his claim of prejudice. *Hammond v. United States*, 880 A.2d 1066, 1086 (D.C. 2005), *abrogated in part on other grounds by Davis v. Washington*, 547 U.S. 813 (2006) (holding that prejudice is assessed in terms of "(1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired") (citations omitted). Consequently, there was no violation of appellant's speedy trial right.

**2. Compulsory Witness Right**

We likewise see no violation of appellant's right to call witnesses. "Due process and the Sixth Amendment right to compulsory process for obtaining witnesses entitle[s] [a defendant] to call witnesses on his own behalf." *Collins v. United States*, 596 A.2d 489, 493 (D.C. 1991) (citations omitted). This right, however, is not without limits, as "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor*.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (emphasis added) (citing U.S. Const., amend. VI). To this end, appellant "must at least make some plausible showing of how [a witness's] testimony would have been both material *and* favorable to his defense." *Id*. (emphasis added).

Appellant cannot show that Fritts' testimony would have been favorable, which is fatal to his claim. The only fact that appellant points to in support of his argument that Fritts' testimony might have been favorable was that Fritts' affidavit left out any mention of appellant "resisting" arrest. However, this omission by itself does not indicate a favorable witness and appellant's contrary contention is speculative because Fritts' statement indicated that appellant was "creat[ing] a

problem," implying that appellant was nonetheless resisting law enforcement. *See Castellon v. United States*, 864 A.2d 141, 161 (D.C. 2004) (finding no error in determination not to compel testimony without showing that it was "material and favorable" or could "affect[ ] the judgment of the trial of fact") (citing *Valenzuela-Bernal*, *supra*, 458 U.S. at 874). As appellant has not made any meaningful showing of favorability, we need not consider materiality.

Because neither appellant's Sixth Amendment right to a speedy trial nor his Sixth Amendment right to call witnesses was violated, appellant was not forced to choose between conflicting Sixth Amendment rights. Accordingly, the trial court did not err by denying appellant the relief that he sought.

## III. Conclusion

Based on the foregoing reasons, we conclude that the trial court did not err in failing to dismiss the criminal information because the charge of misdemeanor APO did not violate the Home Rule Act, and that appellant's Sixth Amendment rights were not violated by failing to either dismiss the case or issue a missing witness instruction. Accordingly, appellant's conviction is

*Affirmed.*